THE STATE OF NEBRASKA; AND THE SERVICE LIFE INSURANCE COMPANY, A CORPORATION, APPELLEES, V. OSCAR W. ECKLUND, EXECUTOR, ET AL., APPELLANTS.

23 N. W. 2d 782

FILED JULY 12, 1946. No. 32066.

*Anderson, Storms & Anderson* and *Beatty, Clarke & Murphy,* for appellants.

*Walter R. Johnson, Attorney General, Robert A. Nelson, Shuman & Overcash,* and *Lloyd Dort,* for appellees.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

PAINE, J.

This is an action in equity, brought by the State of Nebraska and the Service Life Insurance Company, lessee, against Oscar W. Ecklund, executor of the estate of Swan C. Ecklund and a number of heirs interested in said estate and the lands in question. The object of the petition was to establish that the State of Nebraska is the owner of certain riparian lands in the bed of the North Platte River. The answer prayed that the petition be dismissed, and that the court establish the proper boundary line between the lands owned by the plaintiff and defendant. The decree quieted the title to the lands in the plaintiff, and perpetually barred the defendants from claiming any right or title to said land. From this decree the defendants appealed.

The State of Nebraska, as owner, and the Service Life Insurance Company as lessee of lot 1, containing 1.96 acres, on the north bank of the North Platte River, brought this

action against certain defendants to quiet title to a certain tract of land in the plaintiff.

The land involved is riparian land, consisting of approximately 109.6 acres, claimed by the plaintiff, shown by yellow lines on exhibit No. 2, and lying in the old river bed of the North Platte River between the north bank and the thread of the main current now running near the south side. The plaintiff, owning the abutting land of 1.96 acres on the north side of the river, claims this to be its accretion land thereto. The defendant owns lots 4 and 5, of 42.5 acres, opposite thereto on the south side of the North Platte River, all of the said land lying in section 8, township 14, range 32, Lincoln County.

Plaintiff alleged in its petition that the south boundary line of said lot 1 is in dispute, and plaintiff desires that the court determine and permanently establish said boundary line, and prays that, when so established, the title to the land shall be quieted in the plaintiff and against the defendants, and a mandatory injunction issued, commanding defendants to remove the fence erected by them on said land.

The decree sets out that the boundary line "at the time of the original Government survey was the main channel of said North Platte River, which said main channel at a later date was near the north side of said river," and "that the boundary lines of said land have become fixed and established by the gradual changing of the North Platte River throughout the years, and the south boundary line of said real estate is the thread of the main channel of said river at the present time, and which main channel is now the south channel thereof." The decree quieted title in plaintiff, as prayed, and enjoined defendants from trespassing or going upon the land, except to remove a fence which had been erected by defendant Charles Fry, which fence the court ordered removed within 30 days of the date of the decree.

The defendants assign as error that the findings and judgment of the court are contrary to law and contrary to

the evidence. It is further alleged that the court erred in holding that the boundary line of the land involved had been fixed by the gradual changing of the North Platte River throughout the years. It is also charged that the court erred in holding that the change whereby the flow of water in the north channel was diminished and the flow in the south channel increased, was gradual, and in holding that the north channel of the river was not, and is not, the main channel of the river. It is further alleged that the court erred in holding that the south boundary line of plaintiff's land is the thread of the main channel at the present time, which main channel is now the south channel thereof. It is charged as error in several assignments that the court should have found that the boundary line of said real estate was the thread of the stream, and was originally in the main channel along the north bank thereof, and that such boundary line remained fixed and permanent.

It is to be seen that the points contested do not primarily involve questions of law, but do involve the actual factual situation in this locality as to the North Platte River when first surveyed by the government, and the changes in its currents and course down through the years.

The entire contest in this case concerns the ownership of the riparian land in section 8, township 14, range 32. The North Platte River has at times covered more than half of this section 8.

Much of the evidence will relate to this river as we look upstream to the west. The north boundary line of the river reaches into section 5, just north of section 8, then runs a little north of west across section 6, then across sections 1 and 2. Birdwood Creek, an ever flowing stream, comes into the river on the north side in section 2. The south boundary line of the river extends west from about the center line of section 8 across section 7, then section 12, then section 11.

Nearly every witness referred to Ware Island, which lies rather to the south of the center of the channel, and its

eastern end is just west of section 8, and it is over two miles long. It was there when the first witnesses arrived on the scene, and has large cottonwood trees growing on it.

Section 8, involved herein, was granted to the State of Nebraska in lieu of sections 16 and 36 as school land, and consists, first, of lot 1, section 8, owned by the State of Nebraska, which is 1.96 acres in extent, and is a narrow strip along the north bank of the river. To the south of this little wedge-shaped strip of land is a tract of 109.6 acres, extending south across the old bed of the river, grown up with brush and willows in places, and with old, dry channels, in which water may run in the spring floods. Then to the south, and on the south bank exactly opposite of lot 1, is 122.5 acres, making up the south side of section 8, which land was deeded to William A. Paxton, Jr., in 1906 for $857.50, or seven dollars an acre, which was the constitutional minimum price at which such land could be sold at that time.

Eighty acres of this land south of the river are not involved in this trial, but lots 4 and 5, abutting the river on the south side, and consisting of 42.5 acres, belong to the defendants, and the question being litigated is whether the land between the north and south banks belongs as riparian land to the plaintiff's or defendants' holdings.

The defendants claim that, from the time of the original government survey, the thread of the stream ran close to the north side, and as the greater part of the old river bed has relicted, and is covered with willows and brush and good grass for pasture, that the fact that the thread of the present stream is near the south side does not change their right to this old river bed, for the reason that the changes in the course of the river have been caused not by the processes of accretion and reliction but by flowing around intervening land which never in the meantime became its main channel.

The defendants called John E. Ware as a witness, and he testified that he bought Ware Island in 1912 and built a

house on it, and lived there about a year, and sold the island in 1941. He identified exhibit A, being a photostatic copy of a map from the Surveyor General's office, dated May 24, 1870, and exhibit No. 1, which is a map from the same office, dated October 26, 1870. Exhibit No. 1 is a map of the township lying east of the 4th Guide Meridian W, and exhibit A is a map of the township lying immediately west thereof. These maps show that the west end of Ware Island in 1870 was in the northeast quarter of section 11, and ran east across section 12, and nearly across section 7, so that it was a trifle over two miles long and a quarter of a mile wide in the center, and, according to these surveys of 76 years ago, consisted of 179.20 acres.

On exhibit A there is shown a small creek, marked "Tepe Creek," now known as Birdwood Creek, which flows southeasterly across section 2 and into the North Platte River a little east of the west end of Ware's Island on this old map.

Mr. Ware testified that even before he bought the island they had begun to put in hay dams from the north bank across to Ware Island just east of where Birdwood Creek runs into the river, and that these hay dams forced the water to run around the west end of Ware Island and into the south channel, and after it got to the east end of Ware Island the water tried to go back north, but Mr. Ware testified that he put trees in there and put in bodies of old automobiles, and on cross-examination he said he had hauled at least 25 automobile bodies and put in there to keep the water from cutting in on the east end of his island. Mr. Ware was asked when they began to put hay in there to change the course of that water. He replied that he would not say exactly as to the year, but he thought it was in 1894, when the Suburban Irrigation Ditch started to work, or soon after that. The Suburban Ditch had its headgate in the south line of the river south of Ware Island.

Mr. Ware testified that when he first knew the island the greater part of the flow of the North Platte River was to

the north side of the island in the north channel. He testified that at one time they dug a ditch across the west end of the island, leaving about 16 acres west of the ditch, but very little water ever ran through that ditch, and the attempt to get water from Birdwood Creek to go directly southeast across the island, to be used for irrigation on the south side of the river, was given up, and hay dams, strengthened with sand by a pump, were used to send the water around the west end of the island.

On cross-examination he testified that at the present time there are 9.9 acres of deeded land at the east end and 108 acres of school land in the middle, and 59 acres of deeded land, at least, he said, that is what he paid taxes on. He added that there was accretion land at the east end of the island and on the north side of it.

The defendants put in evidence the testimony of a large number of farmers living near the locality who had been familiar with the river for many years. Harlan E. Lindstrum testified that he had known the river since 1900; that at first it was mostly on the north side, and they had put in dams to make it go around the south side of Ware Island, where it was still flowing; that for seven or eight years they had hay dams and then built a regular dam, and that now the main channel is on the south side, ever since they put in the dam; that it carries a larger volume of water since they put the bridge in there; that if they would cut the dam out the water would be back on the north side, for that is the natural flow of the river. He said that the dam there is built mostly of sand and riprap, just an earth dam.

Charles W. Case lives north of Hershey, just two miles west of the Hershey bridge, and his land adjoins the south line of the Ecklund land. He said he had lived there 17 years; that at first most of the water went down the north side of Ware Island; that after they put in the dam the water had a tendency to work back north when it got east of the island. He testified that after the dam was in the

water passed around Ware Island and down through the Suburban headgate. While the floodwaters fluctuated up and down, the water gradually left the Birdwood Channel on the north side after they put in the dam, and the south channel is the main channel now.

Rudolph Peterjohn lives six miles northwest of Hershey, is 78 years old, and has been familiar with the location since 1900. In the early days, when the water was high the water would be on either side of the big island. When the water was really low, there would be no water except in the north side, with a little seep water in the south side. He testified they put the dam across the north channel to throw the water into the irrigation ditch.

Christian Jensen, 81 years old, lives 4½ miles northwest of Hershey, and has been familiar with the river since 1893. He testified that at first water coming from the west flowed on the north side of Ware Island, and when they put in the dam from the mouth of Birdwood Creek across to the island it threw the water over to the south side; that the flow in the river has gotten less as they took it out for irrigation, and only seep water comes down on the north side at the present time.

John Muirhead was employed as foreman by the Suburban Irrigation District, building hay dams, about 1922. He said that after the Sutherland bridge was put in all of the water went down the north side of Ware Island, where the water from Birdwood Creek also went, and when the river was at its lowest the only water that the river would have in it would be in the north channel, where the water from Birdwood Creek ran. He said that Mrs. Cushman claimed that this water was eating her land, which was on the north bank of the north channel, and they put in 50 or 60 big trees and a permanent dam, and finally diverted the water straight across at the west end of Ware Island; that this permanent dam was built about 1932, but they started putting hay dams in about 1922 at the head of Ware Island. The hay dams were put in every year. On cross-examination

he said that the hay dams would wash out every year, but after they got the pump and put in good, strong hay dams it took an awful flood to take them out.

Gus Fransen testified that he is county commissioner of Lincoln County, and had done work for the Suburban Irrigation District in the vicinity of Ware Island. The Suburban headgate is practically south of the middle of Ware Island, in the south bank of the North Platte River. He testified that the sand fills with hay were put in as early as 1912, and turned all the water over to the south side; that when the high water came one fall the permanent dam broke out and the main body of water all went in the north channel. He testified that they began putting in hay dams as early as 1912, and that at one time they tried to run the water across Ware Island in a ditch, but it was not satisfactory. He testified that at the present time the south channel is carrying a large body of water and the north channel only a small amount.

Earl Brownfield, the county treasurer, testified that he had become acquainted with the river in the vicinity of Ware Island in the winter of 1897; that at that time there was no island in the North Platte River except Ware Island, and the main body of water flowed down the north side; that when the river went entirely dry there would be a little water flowing below the mouth of Birdwood Creek down the north bank. He said that since the two steel bridges were put in there has been a north channel and a south channel, but the south channel is much larger, and there is no north channel where the north channel used to be.

The plaintiff called Hugh Dillon, state surveyor, residing in Lincoln, as its first witness. He had surveyed the land in question in August 1945, with three assistants, and exhibit No. 2 and exhibit C bear his signature as state surveyor. He testified that the profile across both channels of the North Platte River showed that the deepest portion of the south channel had an elevation of 88, and the deepest portion of the north channel had an elevation of 89.5. He

found that the south channel carried the most water; that there was very little water in the north channel when he was there yesterday, scarcely any flow; that in building the bridge the south span of the bridge was brought to the north to shorten the bridge, and a fill put in, drawing the south channel to the north and forcing the water under the bridge. He testified that he made no observation near the head of Ware Island to observe whether the water has been changed artificially; that he has never been to the mouth of Birdwood Creek and the head of Ware Island.

Glen R. Dale, a railroad employee, was called by the plaintiff, and testified that he trapped around there as a boy, and that then there were four channels in the river, and he was familiar with the school lease, which was in the name of W. H. Dale, his father; that the flow in the north channel is decreasing, but he never saw the river entirely dry.

The plaintiff then called Eugene F. Gordon, a beekeeper, living at Hershey. He had followed that occupation for 20 years, and years ago had set out hives of bees on the land in question, and would check the hives once a week for nine months the first year. He testified that the south channel had the most water, except in the summertime, and then there appeared to be more water in the north channel, and as the years have gone by the south channel carries far more water than the north channel.

Eugene C. Reed, of Lincoln, associate state geologist and associate director of soil survey and water survey under Dr. Condra, was one of the expert witnesses called by the plaintiff. He testified that he had worked along the Platte River for approximately 12 years, in particular making a study of soils in Lincoln County and other parts of the state; that he put down auger holes in and near the land in question, and told what deposits were found under the surface, and the length of time it took each of such deposits to accumulate; that the accreted lands in the old bed of the North Platte River would be upward of 20 years old; that

willows grow very quickly as water recedes, and that cottonwoods grow if they are not under water except for very brief periods. He described the method of the Platte River, and how it cuts out one side and fills in another, and that the stream flowing eastward in the northern hemisphere has a tendency to go slightly southward, due to the rotation of the earth on its axis, and that at the particular point involved in this lawsuit the river lies between two north bends, one a little to the west of Ware Island, and that the river has a tendency to deposit on the concave side of the bend and to cut out on the convex side of the bend; that this is an established scientific fact, and that the thread of the river at this place has had for a long time a tendency to move to the south; that the filling in of hay dams on the north side of Ware Island would have a tendency to increase the flow of the stream to the south side, but that the bend two miles west of the mouth of Birdwood Creek would cause the main pressure of the water to work toward the south side; that the filling up of the river by some artificial obstruction might temporarily affect the natural process, but that the general swing of the river and the filling up of the north channel was a natural process that had been slowly going on for a number of years; that if a dam had been put in in the neighborhood of Ware Island, much of the water would tend to move through the sand and gravel, for there is always water flowing in the gravel bed below, but that the movement of the main channel to the south was a movement which had been going on gradually for years. The rate of fall of the river at that point is 6½ feet to the mile.

We have endeavored to give a fair reflection of the evidence of each party to this lawsuit, for all admit that it is a question of fact.

An over-all view of the North Platte River at this point, as outlined by these many witnesses would indicate that over fifty years ago in the spring the river was half a mile wide, and nothing appeared above the surface but Ware

Island; that in the late summer in some of the drought years, the river went entirely dry, except perhaps for a small amount of water going down near the north bank, which came in from Birdwood Creek.

It would be a fair conclusion to make from this evidence that many years ago the main center or thread of the stream was near the north side. There is no question that the thread of the stream is now near the center of the channel flowing on the south side, as claimed by the plaintiff.

Many of defendants' witnesses think that innumerable hay dams would account for the change of the current. These hay dams, which were put in to temporarily throw a little more water around the west end of Ware Island into the headgate of the Suburban Irrigation District in dry weather, sometimes lasted a few weeks, but always washed out in a space of months, and did not stop all the water flowing while they were there, for some water always seeped through and the underground water was increased at the place of the hay dam.

With the facts before us as taken from the testimony and the exhibits introduced in this case, we will consider certain phases of the law relating thereto.

"Where title to an island in a nonnavigable stream is conveyed to a grantee by government patent, and the land so conveyed is bounded by the waters of such stream, the grantee's ownership carries with it the bed of the river to the center or thread of each surrounding channel.

"The thread or center of a channel, as the term is above employed, must be the line which would give the owners on either side access to the water, whatever its stage might be, and particularly at its lowest flow." Higgins v. Adelson, 131 Neb. 820, 270 N. W. 502.

"Where, by the process of accretion and reliction, the water of a river gradually recedes, changing the channel of the stream and leaving the land dry that was theretofore covered by water, such land belongs to the riparian owner." Frank v. Smith, 138 Neb. 382, 293 N. W. 329, 134

A. L. R. 458. See, also Conkey v. Knudsen, 141 Neb. 517, 4 N. W. 2d 290.

"Where the water of a river recedes slowly and imperceptibly, changing the channel of the stream and leaving the land dry theretofore covered by water, such land belongs to the riparian proprietor. In case the alteration takes place suddenly, the ownership remains according to former bounds." Gill v. Lydick, 40 Neb. 508, 59 N. W. 104.

"Where, at the time of a grant from the United States, the bank of a river formed a part of the boundary of the grant, subsequent accretions formed by the gradual recession of such bank attached to and became a part of the grant." Topping v. Cohn, 71 Neb. 559, 99 N. W. 372.

"An owner of land on the shore of an unnavigable river, in the absence of restrictions in his grant, owns to the thread of the stream, and his riparian rights extend to existing and subsequently formed islands." Haney v. Hewitt, 105 Neb. 746, 181 N. W. 861.

"Accretion is the process of gradual and imperceptible addition of solid material called alluvion, thus extending shore line by deposits made by contiguous waters. Land uncovered by a gradual subsidence of water is not an accretion, but a reliction. The same law applies to both these forms of addition to real estate which are held to be the property of the abutting landowner. Bigelow v. Herrink, 200 Ia. 830; Hanson v. Thornton, 91 Or. 585; Farnam, Waters and Water Rights (1904) 324; Haney v. Hewitt, 105 Neb. 746; Jefferis v. East Omaha Land Co., 134 U. S. 178; 12 Neb. Law Bulletin, 385; 1 R. C. L. 226, sec. 1." Independent Stock Farm v. Stevens, 128 Neb. 619, 259 N. W. 647.

In the case at bar, the plaintiff owns land on the north bank and the defendants own the land on the south bank of this nonnavigable Platte River, and it has been the law that such ownership of land carries with it the exclusive right and title to the center of the stream. McBride v. Whitaker, 65 Neb. 137, 90 N. W. 966.

"Where the thread of the main channel of a river is the boundary line between two estates and it changes by the slow and natural prosesses of accretion and reliction, the boundary follows the channel." Frank v. Smith, *supra.*

We have now presented a number of decisions on facts very similar to the case in chief. However, there are certain elements in the case at bar which are entirely missing from the cases cited. The land being litigated here is the old bed of the river, which, as more and more water has been taken out for storage above large dams and for irrigation canals, has been relicted and grown up with brush and willows and grass.

The thread of the stream was 40 years ago near the north bank, today it is not far from the south bank, and if the thread of the stream had gradually and imperceptibly moved to the south across all the intervening bed of the river it would, under the authorities cited, have carried the boundary line between plaintiff's and two defendants' lands with it. However, that is not the fact, but the main current to the north gradually became less and less, while the current flowing south of Ware Island became larger, and is now the thread of the stream, and under the authorities, the case falls within a recognized exception to the general rule and the boundary line remains where it was at first.

The case closest in point on the legal proposition involved is found in an opinion in the Eighth Circuit Court of Appeals, in Commissioners v. United States, 270 F. 110. The case was heard before Sanborn and Carland, Circuit Judges, and Munger, District Judge, and the opinion was written by Judge Sanborn, from which we take the following excerpt: "The general rule on this subject is: (1) That where the thread of the main channel of the river is the boundary between two estates and it changes by the slow and natural processes of accretion and reliction, the boundary follows the channel; (2) but, where it changes by the sudden and violent process of avulsion, the boundary remains where the

main channel was at the time of the avulsion, subject always to such changes as may be wrought after the avulsion by accretion or erosion while the old channel is occupied by a running stream. Counsel rely upon the first clause of this rule. That clause is applicable to and governs cases where the boundary line, the thread of the stream, by the slow and gradual processes of erosion and accretion creeps across the intervening space between its old and its new location. To this rule, however, there is a well-established and rational exception. It is that, where a river changes its main channel, not by excavating, passing over, and then filling the intervening place between its old and its new main channel, but by flowing around this intervening land, which never becomes in the meantime its main channel, and the change from the old to the new main channel is wrought during many years by the gradual or occasional increase from year to year of the proportion of the waters of the river passing over the course which eventually becomes the new main channel, and the decrease from year to year of the proportion of its waters passing through the old main channel until the greater part of its waters flow through the new main channel, the boundary line between the estates remains in the old channel subject to such changes in that channel as are wrought by erosion or accretion while the water in it remains a running stream."

We may call attention briefly to the famous Wolf Island case, decided in 1871, in which it was said:

"* * * if Wolf Island, in 1763, or in 1820, or at any intermediate period between these dates, was east of this line, the jurisdiction of Kentucky rightfully attached to it.

"If the river has subsequently turned its course, and now runs east of the island, * * * the boundary between the States remains as before and the island does not, in consequence of this action of the water, change its owner." Missouri v. Kentucky, 11 Wall. 395, 20 L. Ed. 116.

In a much later case somewhat in point, it is said: "The fact that the West branch was gradually closed by accretion

and by the slow deposit of sand from the Pompton river by slow moving water did not shift the boundary line. The boundary line as it was originally located in the old river bed is still in the same place. The gradual closing of the west channel by accretion did not result in a gradual shifting of the boundary line." Courter v. Borough of Lincoln Park, 101 N. J. Eq. 572, 138 A. 99.

In view of the evidence in the record, and in the light of the law as set out herein, we have reached the conclusion that, while the change of the main channel of the North Platte River in section 8, from the north side to its present location on the south side, may have been a gradual change throughout a space of at least 40 years, yet the thread of the stream, flowing on the north side when each of the parties hereto secured their land, did not gradually move over the subsequently formed intervening lands that were formed to the south thereof. However, the south branch of the river flowing south of Ware Island did finally become the main channel, but this was subsequent to the formation of the land herein involved, and the true boundary line between the respective riparian owners remains the line of the thread of the stream where it formerly ran in the north channel.

In the petition it is alleged that the plaintiff and its tenants have been in open, notorious, continuous, exclusive, and adverse possession of said real estate for more than 40 years last past, and are now entitled to the full and complete possession of all the real estate hereinbefore described.

In support of this allegation of the petition, the plaintiff produced the evidence of Eugene F. Gordon, whose testimony on another point has already been summarized. He testified that the ground between the channels was just sandy bottom land; that it used to be heavy with sweet clover, and very little grass; that during those years Eggert, on the north side, had some horses pastured between the channels, and since Mr. Ritter became the tenant he has carried more stock in there, and there has been stock on

this land clear to the north bank of the south channel ever since he knew the land, and it has been so used all the time. He also observed that the Eggerts did trapping there, and also observed Ray Ritter trapping there.

Ray Ritter, the present tenant on the Eggert place, which is plaintiff's school land, has been tenant for only the last five years, and has used this land for pasture and for grazing and feeding purposes. In addition to feeding, he has used it for watering purposes for the livestock. He has used this land up to the main channel, which is the south channel, because the north channel goes dry and there has been no dependable supply of water in the north channel. He testified that he has used all of the land to the north side of the south channel up until Mr. Fry put in a fence, which cut him off from the use of the main channel to water his stock.

In opposition to this, the defendant produced the evidence of Charles Fry, who has leased the Ecklund land on the south side of the river for the past eleven years. He testified that he put a fence up in 1943. As to anybody using the land north of the south channel, he did not remember seeing anything in there, although a fellow had had some cattle in there, but he never saw any cattle or horses to speak of. He built this fence between the two channels in the summer of 1943 upon his own decision, without consulting any of the Ecklunds, and used his own wire and posts.

A careful examination of this evidence fails to disclose that the various tenants occupying the plaintiff's land during these years made any claim to the title thereof against anyone, and neither does the evidence show that they exercised sole, exclusive, or adverse possession to this land.

"The title to land becomes complete in the adverse occupant when he and his grantors have maintained an actual, continued, notorious, and adverse possession thereof, claiming title to the same against all persons, for ten years." Lantry v. Wolff, 49 Neb. 374, 68 N. W. 494. See, also, Conkey v. Knudsen, 135 Neb. 890, 284 N. W. 737.

On this phase of the case, we find that the claim of ten years' open and adverse possession to this land under a claim of ownership was not proved on the part of the plaintiff.

The plaintiffs next contend that the public school lands are a trust held by the State of Nebraska, and by constitutional provisions are in the control of the Board of Educational Lands and Funds; that the disposition of such lands must be strictly in accordance with the constitutional limitations and proper legislative regulations.

It is contended that in 1906 it was a part of a section of land held in trust by the State of Nebraska for the benefit of the schools of this state. The Constitution of 1875, art. VIII, in effect at such time, provides:

"Sec. 8. (Educational lands, price.) University, agricultural college, common school or other lands which are now held or may hereafter be acquired by the state for educational purposes, shall not be sold for less than seven dollars per acre, nor less than the appraised value."

The defendants claim that this is not within the issues of the case as set forth in the pleadings, but plaintiffs argue that this court must take judicial notice of our Constitution.

The record shows that 122½ acres more or less of school land on the south side of the river was sold for $857.50, for exactly seven dollars an acre, as required by the Constitution, and plaintiffs insist that, if there are now over 109 acres of riparian land attached to it, such land belongs to the State, for such accreted land was never sold to the purchaser at seven dollars an acre, as the Constitution required.

We will examine exhibit No. 25, being the state deed for this 122.5 acres *more or less.* It recites that it was sold to Paxton & Hershey on June 27, 1894, and, the whole amount having been paid, the state deed was finally given on March 17, 1906.

The decision must be based on the condition of the river in June 1894, when the state issued its contract to sell this,

land, and the rights of the parties are fixed as of that date.

We have a very similar case, in which we held:

"The board of educational lands and funds has no power in conveying land by deed to add restrictions not contained in the original sales contracts.

"The description 'S. E. ¼ of the S. W. ¼ * * * containing forty acres, more or less,' was sufficient to carry with it all accretions.

"Accretions must be expressly excepted or reserved in a conveyance to avoid a transfer." Mulhall v. State, 140 Neb. 341, 299 N. W. 481.

There is a case, not in regard to riparian land, and still it is in point in holding that the state is bound by the contract originally given in the sale of its lands. It reads: "Where the state had given a contract to sell school-land, and agreed to give a deed in fee simple when the contract was paid in full, the fact that after said contract of sale was given the Constitution of Nebraska was amended, making it illegal to deed away mineral rights on school-land, would not prevent the state from conveying said land under the terms of the original contract." Reavis v. State, 140 Neb. 442, 300 N. W. 344.

In the case of Topping v. Cohn, *supra*, it is said by this court: "Where, at the time of a grant from the United States, the bank of a river formed a part of the boundary of the grant, subsequent accretions formed by the gradual recession of such bank attached to and became a part of the grant."

In Wiltse v. Bolton, 132 Neb. 354, 272 N. W. 197, an Iowa case is quoted to the effect that if accretions are added to government land they become a part of the tract.

In McBride v. Whitaker, *supra*, we said that grants of land bounded upon a river carry with them the rights and title to the center of the stream.

The state, after giving a contract in 1894 for sale of a certain number of acres, to wit, 122.5 acres, "more or less,"

cannot attempt to claim ownership to riparian lands added later thereto.

This is right, for, on the other hand, where a vendor contracts to sell a purchaser land and a building burns down before the deed is given, the loss falls upon the purchaser. McGinley v. Forrest, 107 Neb. 309, 186 N. W. 74, 22 A. L. R. 567.

In the case at bar, the land now in litigation was not shown to be in existence at the time the school land was sold in 1894, for the river covered the entire bed. We therefore hold that the sale by the state of the school land on the south bank carried with it the riparian lands in question, it appearing that such lands came into existence after such sale was made. Consequently, the riparian lands here involved belong to the owner of the lands on the south bank, and the constitutional provision referred to has no application.

For the reasons set out at length herein, we find that the decree of the lower court should be reversed and that a decree should be entered in favor of the defendants.

REVERSED.