were able to recommend placements opined that placement at a treatment level group home was the most effective way to address Skylar's poor judgment and behavior. The evidence in this case shows that a treatment level group home is in Skylar's best interests. Because a treatment level group home is a less restrictive level of care consistent with Nebraska law and Skylar's needs, the trial court abused its discretion in ordering Skylar's placement at YRTC. Accordingly, the order of the juvenile court committing Skylar to YRTC is reversed and the cause is remanded with directions for the court to order DHHS to explore whether less restrictive placement settings are available for Skylar's care, to include, but not be limited to, a treatment level group home.

## CONCLUSION

The trial court abused its discretion in committing Skylar to YRTC when the evidence in the record proves that committing Skylar to a less restrictive level of care was consistent with Skylar's best interests. Accordingly, we reverse the decision of the trial court and remand the cause with directions for the court to order DHHS to explore whether less restrictive placement settings are available for Skylar's care, to include, but not be limited to, a treatment level group home.

REVERSED AND REMANDED WITH DIRECTIONS.

---

KENDALL B. CURRY AND ROBIN L. CURRY, APPELLEES, V.
MARGARET FURBY AND DIANE M. SCHOCH, APPELLANTS.

___ N.W.2d ___

Filed May 7, 2013.    No. A-12-091.

1. **Equity: Boundaries: Appeal and Error.** An action to ascertain and permanently establish corners and boundaries of land under Neb. Rev. Stat. § 34-301 (Cum. Supp. 2012) is an equity action.
2. **Equity: Appeal and Error.** In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

3. **Waters: Boundaries: Title.** Title to riparian lands runs to the thread of the contiguous stream.

4. **Waters: Boundaries: Words and Phrases.** The thread, or center, of a channel is the line which would give the landowners on either side access to the water, whatever its stage might be and particularly at its lowest flow.

5. **Waters: Words and Phrases.** The thread of a stream is that portion of a waterway which would be the last to dry up.

6. **Waters: Boundaries.** Where the thread of a stream is the boundary between estates and that stream has two channels, the thread of the main channel is the boundary between the estates.

7. ____: ____. Where the thread of the main channel of a river is the boundary line between two estates and it changes by the slow and natural processes of accretion and reliction, the boundary follows the channel.

8. **Waters: Words and Phrases.** Avulsion is a sudden and perceptible loss or addition to land by the action of water, or a sudden change in the bed or course of a stream.

9. ____: ____. Avulsion is a change in a stream that is violent and visible and arises from a known cause, such as a freshet or a cut through which a new channel has formed.

10. ____: ____. Accretion is the process of gradual and imperceptible addition of solid material, called alluvion, thus extending the shoreline out by deposits made by contiguous water; reliction is the gradual withdrawal of the water from the land by the lowering of its surface level from any cause.

11. **Waters: Boundaries.** The changes wrought by accretion versus avulsion involve markedly different processes, and each process has a different consequence for the boundary between the landowners on opposite banks of the river.

12. **Waters: Quiet Title: Proof.** A party who seeks to have title in real estate quieted in him on the ground that it is accretion to land to which he has title has the burden of proving the accretion by a preponderance of the evidence.

13. **Waters: Proof.** The burden to show that the channel of a river changed by avulsion is the same as the burden to show that it changed by accretion.

14. **Waters: Boundaries.** When a river changes its main channel not by excavating, passing over, and then filling the intervening place between the old channel and the new channel, but by flowing around the intervening land where the change to the new channel results from an increase year to year in the amount of water flowing in the new channel, the law requires that the boundary line remain in the old channel rather than move to the new channel as long as the old channel remains a running stream.

15. ____: ____. The mean centerline of a river, determined by dividing the distance between meander lines of the river, is an arbitrary location of the center of the stream and is not a determination of the thread of the stream in this jurisdiction.

Appeal from the District Court for Nance County: Michael J. Owens, Judge. Affirmed as modified.

Stephen R.W. Twiss, of Sampson, Curry & Twiss, P.C., for appellants.

Patrick J. Nelson, of Law Office of Patrick J. Nelson, L.L.C., for appellees.

INBODY, Chief Judge, and SIEVERS and MOORE, Judges.

MOORE, Judge.

## I. INTRODUCTION

Margaret Furby and Diane M. Schoch (collectively the Furbys) appeal from an order of the district court for Nance County, which found in favor of Kendall B. Curry and Robin L. Curry in this boundary dispute action filed by the Currys under Neb. Rev. Stat. § 34-301 (Cum. Supp. 2012). On appeal, the Furbys assign error to the court's determination of the location of the boundary along the thread of the stream of the south channel of the Loup River and its use of a metes and bounds description of the thread of the stream. The court did not err in finding that certain surveys are presumptive evidence of the location of the thread of the stream or in finding that the Furbys failed to present sufficient evidence to overcome the presumption. We have modified the description of the boundary between the parties' properties as set forth herein, and accordingly, we affirm as modified.

## II. BACKGROUND

### 1. GENERAL BACKGROUND AND PLEADINGS

The Currys, husband and wife, are the record owners of certain portions of government Lots 6, 7, and 8 and any accretions thereto (the Curry property), located north of the Loup River in Section 3, Township 16 North, Range 5 West of the 6th P.M., in Nance County, Nebraska. The Currys purchased the property in 2002. The original government survey, dated February 21, 1876, of the portion of Section 3 north of the river shows that the north meander line of the river ran along the southeast side of the Curry property.

In 2002, Margaret conveyed a remainder interest in government Lots 1 and 2 (the Furby property) in Section 3, Township 16 North, Range 5 West of the 6th P.M. in Nance County to her son, Russel Furby. Margaret retained a life estate interest in the property. In 2008, Russel conveyed his remainder interest to his sister, Schoch. The original government survey of

the portion of Section 3 to the south of the Loup River shows that at the time of the survey, dated June 30, 1873, Lots 1 and 2 were both located south of the river, with Lot 1 being north of Lot 2. The south meander line of the river ran along the northwest side of the Furby property.

The original government surveys in the record depict the Loup River as flowing across Section 3 between the south meander line and the north meander line with no platted islands in between. The next available evidence in the record depicting the river as it flows through Section 3 is found in aerial photographs from 1937, which depict a north channel and a south channel with an island in between. In other words, over time, the river has moved southerly so that a significant portion of Lot 2 is now located north of the thread of the stream of the south channel of the river and a significant portion of Lot 1 is located on the island. The parties dispute the mechanism by which the river moved to the south and thus the boundary between their properties.

In their operative complaint, the Currys claim that the river moved southerly by the process of accretion and reliction. The Currys asked the district court to establish the southwest corner, the south boundary, and the southeast corner of their property at the thread of the stream of the south channel of the river, in other words, south of the island.

In their answers, the Furbys denied that the river moved by virtue of accretion and reliction, alleged that the boundaries and corners as set forth in the operative complaint were not the true boundaries and corners of the Curry property, and alleged that the north boundary of the Furby property remained north of the island at the thread of the Loup River as measured from the original meander lines established in the original government surveys.

## 2. TRIAL EVIDENCE

Trial was held before the district court on July 12 and 13, 2011. A significant amount of evidence was adduced, and we summarize the relevant evidence below.

In 2002, prior to purchasing the Curry property, the Currys commissioned a registered land surveyor, Thomas Tremel, to

conduct a survey of the property. In his 2002 survey, Tremel depicted, among other things, two Loup River channels—a "Loup River Dry Channel" on the north side of the island and a "Loup River Main Channel" on the south side of the island. Tremel also depicted the "Thread of the Stream" of the "Loup River Main Channel." A note on the survey states that the banks of the Loup River and the thread of the stream were "scaled from the Nebraska Department of Resources 1993 digital orthophotos." Tremel's 2002 survey contains the following legal description of the southwest corner, south boundary, and southeast corner of the Curry property:

> [T]hence S 00°00′12″ W, parallel with the East line of said Section 3, approximately 1838 ft. to the thread of the stream of the Loup River; thence Northeasterly on the thread of the stream of said Loup River approximately 2042 ft. to the Southerly extension of the East line of said Section 3; thence N 00°00′12″ E, approximately 2494 ft. on the Southerly extension of the East line and the East line of said Section 3 to the point of beginning . . . .

After the Currys purchased the Curry property, Russel commissioned a surveyor, Leroy Gerrard, to survey the Furby property in order to ascertain the boundaries of the Furby property in relationship to the island. Gerrard's retracement survey, dated January 5, 2005, and revised on March 4, shows the meander lines of the Loup River and the boundaries of Lots 1 and 2 as originally platted in 1873 and their relationship to the north and south channels of the river and the island as they existed in 2005. It shows that the north channel was dry in 2005, that the retraced Lot 1 overlaps a portion of the island, and that the retraced Lot 2 overlaps both a portion of the south channel and a small portion of the island. On the survey, Gerrard stated:

> The exterior lines of government Lots One (1) and Two (2) in Section Three (3), Township Sixteen (16) North, Range Five (5) West of the 6th P.M., Nance County, Nebraska have been surveyed and monumented as said exterior lines are delineated on the original government survey dated June 30, 1873. All surveyed lines lying

in the Loup River or on the island in the Loup River are for historical reference only and do not define nor imply ownership.

On February 23, 2007, Tremel prepared a composite drawing of his own 2002 survey and Gerrard's 2005 survey, overlaid onto a 2003 aerial photograph, which depicts the positions of the two tracts surveyed by Gerrard and Tremel relative to each other and to the physical geographic features depicted in the photograph.

Tremel testified at trial that he found no evidence of avulsion during his work relating to his 2002 survey. One of the things he did in reaching such a determination was walk down the dry north channel and examine "how the swales configured [both] the [north and south] banks of the river." Tremel testified that he did not observe any evidence of an avulsive event. He testified that in his experience, the best evidence of avulsion is where there is a direct channel cut through the land outside of the original riverbed, leaving behind a definable dry bed in the old channel, which he did not observe here. He did not believe an avulsive event occurred, based upon his observation of the terrain near the south channel, which revealed low-lying vegetation to the north of the south channel and no vegetation to the south. Tremel did not review any historic flood or flow records in connection with his surveys, but he did review aerial photographs of the area from 1937, 1938, and 1950.

Tremel was asked about Lot 1, which was on the south side of the river as originally platted and appears north of the thread of the stream of the south channel in Tremel's composite drawing. Tremel testified that in his opinion, Lot 1 had been washed away by the action of the Loup River and did not exist any more. Tremel based that opinion in part on his review of a 1938 photograph, which he testified "shows all that land gone." Tremel further opined that the land depicted in his survey from the north bank of the river down to the thread of the stream of the south channel was accretion to Lots 6, 7, and 8.

In the latter part of 2010, at the request of the Currys' attorney, Tremel did further surveying work and revised his

2002 survey to reflect additional points along the north and south banks of the south channel of the Loup River. Both the 2002 and 2010 surveys note that the banks of the river and the thread of the stream were scaled from 1993 aerial photographs. Tremel indicated that although he had walked in and physically observed the area, he did not physically measure the banks of the river; rather, he derived measurements from "orthophotos." In his 2002 survey, Tremel split the difference between the banks of the south channel to mathematically scale the thread of the stream. He testified that he labeled the "'thread of the stream'" on his 2002 survey for "descriptive purposes," but testified that this was not necessarily the true line of the thread of the stream at that time.

In connection with his additional survey work, on September 29 and November 22, 2010, Tremel again physically observed the Loup River to determine the approximate location of the thread of the stream. From an airboat, Tremel made observations of the amount of water flowing in the south channel, the depth of the water, and where the greatest volume of water was at the relevant location. Tremel then prepared a survey overlaid onto a 2006 aerial photograph, placing thereon the boundaries of the tract he surveyed as well as the approximate location of the thread of the stream, based on his observations. We note that the line on the overlay showing the approximate thread of the stream based on Tremel's observations falls generally to the south of the scaled-in thread-of-the-stream line depicted on his 2002 and revised 2010 surveys. As to both surveys, Tremel testified that he filed them per Neb. Rev. Stat. § 81-8,122.01 (Reissue 2008) and that they contained the minimum data required by the statute.

The record also contains photographs taken by Kendall of the Loup River at the relevant location in 2010. The photographs taken by Kendall depict the water in the south channel and the amount and type of vegetation on the island and in the north channel.

Russel first observed the Loup River at the relevant location in about 1973, when he was 7 or 8 years old. There was water flowing in both channels at that time, and the south

channel was too deep to cross on foot. Since 1973, Russel has observed the water in the Loup River to flow in one channel or the other or both channels, switching its flow and which channel appeared to be the main channel on numerous occasions. Russel did not recall the island's ever washing away. Russel last observed water flowing in the north channel in 1992 while hunting off the west end of the island. According to Russel, the south channel was dry at that time and the flow of water in the north channel was quite fast. Russel described an ice jam and flooding in the spring of 1993 that plugged the north channel with sand and left the south channel as the deepest channel. Every time Russel has observed the north channel since 1993, it has been dry. By 2008 or 2009, when he last observed the north channel, there was a lot of underbrush and other vegetation growing in it. Schoch's husband testified about his observations of the river's flow around the island since about 1988, which were consistent with Russel's observations.

M. Stanley Dart, an emeritus associate professor of geography for the University of Nebraska at Kearney, testified on behalf of the Currys. His principal areas of teaching were in physical geography and geology. Through his education, training, and work, Dart had become knowledgeable about rivers, and he had focused at times on "fluvial geomorphology," which he described as the "processes that rivers undergo as they flow, and the various types of rivers." Dart testified at length regarding the characteristics and history of the Loup River.

According to Dart, the Loup River, like the Platte River also in Nebraska, is a braided stream characterized by a large sediment load composed mostly of sand or small particles. The river tends to be rather shallow and oftentimes quite wide, with very low banks and broad expanses. In a braided stream such as the Loup River, where there is a bend in the river, the bank on the outside curve of the bend will tend to erode and the bank on the inside curve of the bend will tend to accumulate sediment deposits. In other words, there is more likelihood of accretions' being added to the land on the shore on the inside of a curve.

In his work as a college instructor, Dart made extensive use of aerial photographs to demonstrate a range of geographic phenomena. At the request of the Currys' attorney, Dart reviewed and analyzed numerous historical aerial photographs of the land in dispute in this case. After thoroughly reviewing and analyzing each of the aerial photographs contained in an exhibit comprising many such photographs from 1937 to 2010, Dart marked the island in dispute on each photograph and offered a number of opinions about the evolution of the Loup River based upon his review.

According to Dart, the Loup River changed as expected over the 73 years between the first aerial photographs in 1937 to the last aerial photograph in 2010. Dart testified that the river "is eroding, it is depositing, it is moving sediment, it does so regularly and consistently, and to a degree in a predictable pattern." Dart observed that the main channel of the Loup River as it passes the island in dispute was on the south side of the island until about 1980. Between 1980 and 1993, the main channel of the Loup River as it passed the island varied back and forth from the north side of the island to the south side of the island. In 1993, and consistently thereafter, the main channel of the Loup River had been in the south channel, on the south side of the island. Dart's review of the photographs showed that the island had existed in the river since at least 1937. Dart noted that in 1937, the island had significant mature vegetation, indicating that the island had "been there a sufficient period of time to become stabilized." On cross-examination, Dart admitted that he did not know what might have changed the course of the Loup River between the original government survey and 1937. He agreed that the island could have been formed by either erosion or avulsion, but he testified that the island might also have been the result of deposition of material in the channel of the stream.

### 3. JUDGMENT AND POSTTRIAL PROCEEDINGS

The district court entered an order on October 14, 2011, finding in favor of the Currys and establishing the south boundary of their property along the thread of the stream of

the Loup River to the south of the island. The court found that both the 2002 and 2010 Tremel surveys met all of the foundational requirements of § 81-8,122.01 and were thus presumptive evidence of the facts stated therein, specifically the location of the thread of the stream. The court found that the evidence adduced by the Furbys was not sufficient to overcome the statutory presumption. While the court noted prior appellate decisions acknowledging the difficulty of an accurate determination of the location of the thread of a stream, it accepted Tremel's conclusion as to the location of the thread of the stream.

The district court discussed the Furbys' argument that the formation of the south channel of the river sometime between 1873 and 1937 and the changes to the flow of the river following the massive ice jam in the spring of 1993 support a finding that the boundary line remains north of the island at the thread of the stream between the originally surveyed meander lines. In rejecting this argument, the court relied on Dart's testimony. Specifically, the court noted Dart's opinion that the island in question was in existence prior to 1937. The court noted Dart's testimony that the south channel existed prior to 1937 and was clearly the main channel of the river at that time, and it found this testimony to be compelling. Accordingly, the court found that the Furbys' contention that the thread of the stream was in the north channel was not supported by the evidence.

The district court discussed the Furbys' contention that the 1993 ice jam was an avulsive event which changed the main channel of the Loup River from the north channel to the south channel. In rejecting this contention, the court relied on photographic evidence presented by the Currys regarding the flow of the river prior to 1993 and found that the thread of the stream was on the south side of the island prior to 1937. The court also found that the Furbys failed to present sufficient evidence in support of what it termed the "'flowing around intervening land mass' rule" set forth in *State v. Ecklund*, 147 Neb. 508, 23 N.W.2d 782 (1946), which we discuss in greater detail in the analysis section below.

The district court found in favor of the Currys and set the south boundary of their property at "the thread of the stream of the Loup River as depicted and described in [Tremel's 2002 survey] and [the certified copy of Tremel's 2010 survey]." The court then set forth a legal description of the thread of the stream as "set forth in [the Currys'] operative complaint."

The Currys filed a timely motion to alter or amend the judgment, alleging that the legal description of the thread of the stream contained in the district court's order was taken from their original complaint, filed in October 2009, and not from their amended complaint, filed in January 2011, as the court intended. The Currys asked the court to revise the legal description in its order to correspond to the description contained in the actual operative complaint. Following a hearing, the court entered an amended order, finding that the south boundary of the Curry property was the thread of the stream of the Loup River "as depicted and described in Exhibit 76." Exhibit 76 is an overlay of Tremel's 2010 survey on a 2006 aerial photograph. The legal description of the south boundary set forth in the amended order corresponds to that found in the Currys' actual operative complaint, as follows:

> Commencing at the Northeast corner of Section 3, Township 16 North, Range 5 West of the 6th Principal Meridian, Nance County, Nebraska, and assuming the East line of said Section 3 as bearing S 00°00′12″ W, and all bearings contained herein are relative thereto; thence S 00°00′12″ W, on the East line of said Section 3, a distance of 1,530.55 feet; thence S 84°24′26″ W, a distance of 48.19 feet; thence S 31°25′56″ W, a distance of 280.42 feet; thence S 56°33′59″ W, a distance of 105.07 feet; thence S 77°25′57″ W, a distance of 61.98 feet; thence S 42°44′21″ W, a distance of 455.66 feet; thence S 71°17′58″ W, a distance of 474.63 feet; thence S 60°49′25″ W, a distance of 127.80 feet; thence S 81°51′29″ W, a distance of 466.72 feet; thence S 72°02′22″ W, a distance of 589.03 feet; thence S 39°22′42″ E, a distance of 506.61 feet; thence S 52°40′51″ E, a distance of

111.75 feet; thence S 00°00′12″ W, parallel with the East line of said Section 3, if extended southerly, a distance of 2,331 feet, more or less, to a point on the thread of the stream of a channel of the Loup River, which point is **the actual point of beginning**; thence Northeasterly, on the thread of the stream of such channel of the Loup River, a distance of 2,322 feet (direct measure), more or less, to a point on the East line of said Section 3, if extended southerly, such point being located 4,024.55 feet, more or less, South of the Northeast corner of said Section 3, which point is the point of termination (said boundary line being hereinafter referred to as "Plaintiffs' South Boundary Line")[.]

The Furbys subsequently perfected their appeal to this court.

### III. ASSIGNMENTS OF ERROR

The Furbys assert, as combined and summarized, that the district court erred (1) in determining that the boundary between the parties' properties is at the thread of the stream in the south channel of the Loup River rather than at the thread as measured from the original meander lines established in the original government surveys and (2) in establishing a precise legal description of the thread of the stream using a metes and bounds description.

### IV. STANDARD OF REVIEW

[1,2] An action to ascertain and permanently establish corners and boundaries of land under § 34-301 is an equity action. *Anderson v. Cumpston*, 258 Neb. 891, 606 N.W.2d 817 (2000); *Oppliger v. Vineyard*, 19 Neb. App. 172, 803 N.W.2d 786 (2011). In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Prime Home Care v. Pathways to Compassion*, 283 Neb. 77, 809 N.W.2d 751 (2012).

## V. ANALYSIS

### 1. WATER LAW PRINCIPLES

Before addressing the Furbys' assignments of error, we first set forth some basic principles of water law.

[3-7] Title to riparian lands runs to the thread of the contiguous stream. *Obermiller v. Baasch*, 284 Neb. 542, 823 N.W.2d 162 (2012). The thread, or center, of a channel is the line which would give the landowners on either side access to the water, whatever its stage might be and particularly at its lowest flow. *Id*. The thread of a stream is that portion of a waterway which would be the last to dry up. *Id*. Where the thread of a stream is the boundary between estates and that stream has two channels, the thread of the main channel is the boundary between the estates. *Oppliger v. Vineyard, supra*. Where the thread of the main channel of a river is the boundary line between two estates and it changes by the slow and natural processes of accretion and reliction, the boundary follows the channel. *Anderson v. Cumpston, supra*.

[8-11] Avulsion is a sudden and perceptible loss or addition to land by the action of water, or a sudden change in the bed or course of a stream. *Id*. Avulsion is a change in a stream that is violent and visible and arises from a known cause, such as a freshet or a cut through which a new channel has formed. See *Conkey v. Knudsen*, 141 Neb. 517, 4 N.W.2d 290 (1942), *vacated on other grounds* 143 Neb. 5, 8 N.W.2d 538 (1943). On the other hand, accretion is the process of gradual and imperceptible addition of solid material, called alluvion, thus extending the shoreline out by deposits made by contiguous water; reliction is the gradual withdrawal of the water from the land by the lowering of its surface level from any cause. *Monument Farms, Inc. v. Daggett*, 2 Neb. App. 988, 520 N.W.2d 556 (1994). The changes wrought by accretion versus avulsion involve markedly different processes, and each process has a different consequence for the boundary between the landowners on opposite banks of the river. *Oppliger v. Vineyard, supra*.

[12,13] A party who seeks to have title in real estate quieted in him on the ground that it is accretion to land to which he

has title has the burden of proving the accretion by a preponderance of the evidence. *State v. Matzen*, 197 Neb. 592, 250 N.W.2d 232 (1977). In *Oppliger v. Vineyard*, 19 Neb. App. 172, 803 N.W.2d 786 (2011), this court stated that the burden to show that the channel of the river changed by avulsion obviously would be the same.

## 2. Application of Statutory Presumption

The Furbys first argue that the Currys did not sustain their burden of proving that the thread of the stream changed by the process of accretion, such that the thread of the stream is now located in the south channel of the river. However, the district court did not find that the Currys proved the change in the thread of the river by accretion; rather, the court found that the 2002 and 2010 Tremel surveys are presumptive evidence of the location of the thread of the stream. The court relied on § 81-8,122.01 in accepting Tremel's conclusion as to the location of the thread of the stream.

Section 81-8,122.01 provides:

> Whenever a survey has been executed by a land surveyor, registered under the provisions of sections 81-8,108 to 81-8,127, a record of such survey bearing the signature and seal of the land surveyor shall be filed in the survey record repository established pursuant to section 84-412 if such survey meets applicable regulations. . . . The record of survey shall be filed within ninety days after the completion of the survey . . . and shall consist of the following minimum data: (1) Plat of the tract surveyed; (2) legal description of the tract surveyed; (3) description of all corners found; (4) description of all corners set; (5) ties to any section corners, quarter corners, or quarter-quarter corners found or set; (6) plat or record distances as well as field measurements; and (7) date of completion of survey. The record of survey so filed shall become an official record of survey, and shall be presumptive evidence of the facts stated therein, unless the land surveyor filing the survey shall be interested in the same.

Because Tremel's 2002 and 2010 surveys met all of the foundational requirements of § 81-8,122.01, the district court found them to be presumptive evidence of the facts stated therein, specifically as to the location of the thread of the stream.

We agree based on our de novo review of the record that Tremel's surveys meet the foundational requirements of § 81-8,122.01. Tremel testified that he executed the surveys when he was a registered land surveyor, that a record of each survey bearing his signature and seal was filed in the survey record repository within 90 days after the survey's completion, and that both surveys contained the minimum data required by statute. Specifically, he testified that both surveys contained a plat and legal description of the tract surveyed; a description of all corners found and all corners set; ties to any section, quarter, or quarter-quarter corners found or set; a plat or record of distances as well as field measurements; and the date of the survey's completion. He also testified that he had no personal interest in the land shown in the surveys. Thus, the surveys are presumptive evidence of the facts stated therein, including the fact that the thread was located in the south channel at the time of the surveys, and the district court did not err in applying the statutory presumption. As such, it was unnecessary for the Currys to establish that the thread of the stream changed through the process of accretion.

### 3. Did Furbys Overcome Statutory Presumption?

We next turn to the question of whether the Furbys overcame the statutory presumption.

The Furbys argue that the boundary line remains as established in the original government surveys; in other words, in the north channel. In support of establishing the boundary in the north channel, the Furbys assert that there was either sufficient evidence to show that the thread of the stream changed through avulsion or evidence of other processes recognized in the exception found in *State v. Ecklund*, 147 Neb. 508, 23 N.W.2d 782 (1946).

The district court concluded that the evidence adduced by the Furbys was not sufficient to overcome the presumption

established by the statute, specifically finding that they failed to establish avulsion or their arguments with respect to the exception found in *State v. Ecklund*, *supra*.

## 4. Did Furbys Present Sufficient Evidence of Avulsion or Other Exception?

The Furbys contend that there have been two substantial changes in the flow of the Loup River in the pertinent area. They allege that the first change occurred between 1873 and 1937 and formed what is now the south channel and that the second change occurred as a result of the ice jam in the spring of 1993.

### (a) Change Between 1873 and 1937

The original government surveys depict the Loup River as flowing across Section 3 between the south and north meander lines with no platted islands in between. The next available evidence in the record is found in aerial photographs from 1937 which depict a north channel and a south channel with an island in between. Testimony from Dart established that the south channel was the main channel of the river in 1937. The Furbys contend that the vegetation shown on the original government surveys suggests that the south channel could have been formed between 1873 and 1937 by water rushing through a high water channel in an avulsive event; however, there is nothing in the record to affirmatively show that this in fact occurred. Although Dart agreed this theory was a possibility, he testified that he did not know what caused the south channel to form during this period of time and that it was also possible it could have formed slowly over time by erosion or from the deposition of material in the channel.

Tremel testified that he did not see any evidence of avulsion during his examination of the property in connection with his 2002 survey. Specifically, Tremel based this conclusion on his examination of the banks of the dry north channel and of the south channel.

The Furbys did not adduce affirmative evidence to show that an avulsive event occurred between the time of the

government survey in 1873 and 1937. There is no evidence that during this timeframe, there was a sudden and perceptible change to the land by the action of water or in the bed or course of the river, or a violent and visible change from a known cause. See *Babel v. Schmidt*, 17 Neb. App. 400, 765 N.W.2d 227 (2009).

### (b) *State v. Ecklund* Exception

[14] Alternatively, the Furbys argue that the exception found in *State v. Ecklund*, 147 Neb. 508, 23 N.W.2d 782 (1946), is applicable. In that case, the north channel of the river had originally carried most of the water, but after dams had been built upstream, the south channel began to have more flow and was considered the thread of the stream. The Nebraska Supreme Court found that the exception to the law of accretion and avulsion detailed in *Frank v. Smith*, 138 Neb. 382, 293 N.W. 329 (1940), applied to the boundary dispute. As recognized in *Frank*, this exception applies when a river changes its main channel not by excavating, passing over, and then filling the intervening place between the old channel and the new channel, but by flowing around the intervening land where the change to the new channel results from an increase year to year in the amount of water flowing in the new channel. In that situation, the law requires that the boundary line remain in the old channel rather than move to the new channel as long as the old channel remains a running stream. See *id*. In *Ecklund*, the court concluded that while the change of the main channel from the north side of the river to its present location on the south side may have been a gradual change throughout a space of at least 40 years, the thread of the stream did not gradually move over the subsequently formed intervening lands. As such, the boundary remained the line of the thread of the stream where it formerly ran in the north channel. *State v. Ecklund, supra*.

This court has recognized that in cases where this exception has been applied, there was ample evidence that the river did in fact change course in a sudden and violent manner, as well as evidence as to how that change took place. See *Babel v. Schmidt, supra*.

In the present case, there was insufficient evidence to establish that the river changed in such a manner as described in *Frank v. Smith, supra*, or in *State v. Ecklund, supra*. As mentioned above, Dart testified that he did not know what caused the south channel to form between 1873 and 1937, but that it was possible that it could have formed slowly over time by erosion, by the river's rushing through it in a single avulsive event, or from the deposition of material in the channel. As such, the evidence in this case does not support application of this exception.

Based on our de novo review, we agree with the district court that the Furbys failed to adduce sufficient evidence both to support their contention that the south channel was formed by avulsion or any other process and to overcome the statutory presumption.

### (c) 1993 Ice Jam

The Furbys assert that the 1993 ice jam was an avulsive event that permanently changed the location of the main channel from the north side to the south side of the island, requiring us to find that the north channel remained the legal boundary. In discussing this contention, the district court noted the evidence presented by the Currys regarding boundary locations prior to 1993, specifically the exhibit comprising many aerial photographs from 1937 to 2010, which were reviewed and discussed by Dart. Upon reviewing that evidence, the court found that the thread of the stream was on the south side of the island prior to 1937 and otherwise rejected the Furbys' arguments about avulsion.

In our de novo review, we conclude that the occurrence of the ice jam in 1993 does not support a finding that the thread of the stream should remain in the north channel as depicted in the original government surveys. As discussed above, the island and south channel were formed prior to 1937, and the south channel was the main channel from sometime before 1937 until about 1980. During this time, the north channel carried less water than the south channel and was occasionally dry. After 1980, the evidence suggests that the main channel alternated between the north and south channels, but that after

the ice jam in 1993, the north channel has become dry and the south channel is the main, and only, channel to carry water. In other words, the thread of the stream remains in the south channel, as was true prior to 1980. Again, the evidence regarding the changes in the river between 1980 and 1993 does not overcome the statutory presumption regarding the thread of the stream.

### 5. Legal Description of Thread of Stream

Finally, the Furbys assert that the district court erred in granting the Currys' motion to alter or amend the judgment, finding that a precise legal description of the thread of the stream was established by the evidence, and precisely describing the southern boundary of the Currys' property using a metes and bounds description of the location of the thread of the stream. In its amended order, the court found that the south boundary of the Curry property was the thread of the stream of the Loup River "as depicted and described in Exhibit 76," and it set forth a legal description corresponding to that found in the operative complaint.

[15] In support of their argument, the Furbys cite *Oppliger v. Vineyard*, 19 Neb. App. 172, 803 N.W.2d 786 (2011). In *Oppliger*, this court determined that the boundary between the parties' properties was the thread of the stream of the north channel of the North Platte River. We then addressed whether the precise location of the thread could or should be addressed by a metes and bounds description. We stated:

> As to precisely and exactly where [the thread of the stream] is in a metes and bounds description, such is not before us and is inherently impractical, and in reality, such would rarely be subject to precise measurement and legal description beyond the conceptual definition we have employed for the thread of the stream throughout our opinion. Therefore, the thread of the stream of the North Platte River is found in the north channel, and it fits the definition of "thread of the stream" [found in Nebraska case law].

*Oppliger v. Vineyard*, 19 Neb. App. at 208, 803 N.W.2d at 812. The land surveyor in *Oppliger* prepared a composite survey map that platted the geographic centerline of the north channel superimposed on an aerial photograph with a metes and bounds description. This court observed that the surveyor had clearly platted the middle of the north channel measured bank to bank. We found that the mean centerline of a river, determined by dividing the distance between meander lines of the river, is an arbitrary location of the center of the stream and is not a determination of the thread of the stream in this jurisdiction. *Id*. We further observed that

> as a practical matter, the precise and exact location of the thread would become important only in times of drought and extremely low flow. Of the numerous Nebraska cases involving the thread of a stream, none contains a precise metes and bounds legal description of its location. [Citations omitted.] We conclude that such a description is neither required nor practical given that the thread of the stream is a legal concept and that pinpointing its exact location is inherently difficult, if not impossible, until a river actually dries up, which event would then reveal the thread's precise location, i.e., where the last little bit of flowing water could be found.

*Id*. at 209, 803 N.W.2d at 813.

The Furbys also observe that in its amended order, the court found that the boundary was the thread of the stream of the Loup River as depicted and described in exhibit 76. Exhibit 76 does not contain any legal descriptions and shows both the scaled-in thread-of-the-stream line shown on Tremel's surveys (i.e., the line he derived by dividing the distance between the banks of the south channel) and the line showing the approximate thread of the stream as observed by Tremel from an airboat in September and November 2010.

The Currys observe that the legal description found in their operative complaint and the district court's original and amended orders employs a "more or less" distance description to arrive at the location of the thread of the stream. They agree that the court's statement that the boundary is the

thread of the stream "as depicted and described in Exhibit 76" is not entirely correct, as there is no legal description contained in exhibit 76. They assert that such error is insignificant, however, given this court's determination in *Oppliger v. Vineyard*, 19 Neb. App. 172, 803 N.W.2d 786 (2011), that no precise or exact legal description of the thread of the stream is required. The Currys argue that there is a practical reason why exhibit 76 is significant and why Tremel's depiction of the approximate thread of the stream as observed in 2010 and the approximate distances shown thereon are important. They assert that without a description which comes relatively close, using descriptive phrases such as "more or less" and "approximately," future disputes might well arise over whether the thread of the stream is located on the north or south side of what appears to be a new island forming south of the island in dispute in this case.

We agree that a metes and bounds description is unnecessary and inherently impractical for the reasons we previously stated in *Oppliger*. Thus, we modify the district court's order to establish that the boundary between the Curry property and the Furby property is the thread of the stream of the Loup River, which thread is located in the river's south channel south of the island as generally depicted in exhibit 76.

## VI. CONCLUSION

The district court did not err in applying the statutory presumption found in § 81-8,122.01 or in finding that the Furbys failed to present sufficient evidence to overcome the presumption. We modify the description of the boundary as set forth above.

AFFIRMED AS MODIFIED.