AARON SILA, APPELLEE, V.
KIRK SAUNDERS, APPELLANT.
743 N.W.2d 641

Filed January 11, 2008.    No. S-06-1160.

Lance D. Ehmcke, Jeremy J. Cross, and Joel D. Vos, of Heidman, Redmond, Fredregill, Patterson, Plaza, Dykstra & Prahl, L.L.P., for appellant.

Paul W. Deck, of Deck & Deck, L.L.P., for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

McCORMACK, J.

## NATURE OF CASE

Aaron Sila brought this action under Neb. Rev. Stat. § 34-301 (Reissue 2004) to establish the east boundary line of his property adjoining the property of the defendant, Kirk Saunders. Sila sought to establish the boundary line in accordance with the original government survey. Kirk asserted that under theories of mutual acquiescence and adverse possession, the historically recognized boundary should instead be acknowledged.

## BACKGROUND

The properties in issue were once part of a single 78-acre farm owned by Kirk's grandfather, Fred Saunders. Fred owned and farmed the land from the early 1940's until his death in 1961. After Fred's death, the land was divided into three parcels and given to his three sons: Vern Saunders, George Saunders, and Kirk's father, Eugene Saunders. George was given the smaller parcel of 18 acres immediately to the east of a county road. Vern and Eugene were each given adjacent 30-acre parcels to the east of George's 18 acres. A year later, Vern died, and his 30 acres were acquired by Eugene. Kirk eventually inherited a 20-acre segment of Eugene's 60 acres. That segment abuts the disputed 18-acre parcel originally given to George, and most recently acquired by Sila. It is the boundary between these two properties that is currently in dispute.

In 1962, George and Eugene set about establishing the shared boundary of their properties. Eugene's son and Kirk's brother, Elliotte Saunders, was a teenager at the time. He assisted in measuring the boundary and helped Eugene farm the land east of the 18-acre parcel until Eugene's death in 1989. Elliotte testified that their purpose in measuring and marking the boundary was "[t]o split the farm up to get a boundary line so [George] knew what he owned and what my dad owned."

George's 18 acres were legally described as: "The West Thirty-Six (36) rods of the North Half of the Northwest Quarter (N 1/2 NW 1/4) of Section Thirteen (13), Township Twenty-Nine (29) North, Range Seven (7) East of the Sixth Principal Meridian, Dakota County, Nebraska." George and Eugene decided not to hire a professional surveyor to mark the

boundary. There was a barbed wire fence along the north and south borders of the properties, and George and Eugene mistakenly believed that the middle of the county road represented a section line marking the west boundary of George's 18 acres. Thus, George and Eugene, with Elliotte's assistance, took a 100-foot tape measure and some flags and measured 594 feet (36 rods) east from the middle of the county road. Elliotte testified that they crimped a penny over the barbed wire and tied red flags on the fence at the 594-foot line of both the north and the south ends of the properties.

After this, George's crops were farmed on the west side of the boundary and were planted in a north-south direction. Eugene planted his crops on the east side of the boundary in an east-west direction. An aerial photograph from 1966 shows a clear demarcation between the two parcels that appears to be parallel to the county road from which the boundary had been measured.

Elliotte testified that over time, the red flags wore away. Along the north barbed wire fence, a row of trees grew up. Eventually, a tree grew into the barbed wire fence where the penny was crimped. The fence and the penny remained visible, however, embedded in a knot in the tree. The trees were later cut down, but the stumps remained, including the stump containing a piece of the barbed wire with a crimped penny around it. It is unclear when exactly the tree grew into the fence or when it was cut down, but, in any event, there is no evidence that the basic location of the crimped penny changed.

In 1965, Kirk moved into a mobile home placed on the southeast corner of Eugene's 60 acres. As part of the improvements around the home, they removed the barbed wire fence on the south end of the property. However, Kirk testified that before removing the fence, they placed a water well "right next to the property line" that was designated by the crimped penny in the south fence. Elliotte similarly testified that Kirk and George discussed the placement of the well and agreed to set it "kind of on the line" between the two properties. Although Kirk sought George's approval of the placement, there is no indication that Kirk asked George's permission to place the well on George's property. Rather, it appears that the discussion was to ensure

that the well was placed on Eugene's property. Elliotte testified that after the removal of the fence in 1965, the well was understood by George and Eugene to be the south visual marker for the boundary between their properties.

Elliotte testified that George and Eugene farmed their respective lands in accordance with the well on the south end and the crimped penny on the north end for 21 years. When George died in 1986, his 18 acres passed to his wife, Anna Saunders, who put the land into a trust. Eugene and Elliotte continued to farm Eugene's 60-acre parcel, and they also farmed Anna's land for the trust, but they maintained the crop boundary line according to the well/stump boundary.

When Eugene died in 1989, Elliotte continued to farm Anna's land and the 20 abutting acres inherited at this time by Kirk. At this time, Elliotte decided, for the sake of efficiency, to farm Kirk's 20 acres and Anna's 18 acres together without planting the crops in differing directions. Elliotte stated that he still considered the well and the tree stump as boundary markers. The evidence was inconclusive as to whether Anna or her trustee specifically recognized the well/stump boundary markers. Elliotte gave Anna's trust her share of the profits from the crops and divided the proceeds from the 20 acres between himself and Kirk.

Sila purchased the 18 acres from Anna's trust in 2001. He did not notice any demarcation between Anna's and Kirk's parcels at that time. Neither did he have a survey of the property conducted prior to the purchase to mark the boundary in accordance with the legal description. Sila testified that the real estate agent referred to the property line's being near a "high line pole" on the east end of the field in reference to the division of the properties. The location of this pole is not reflected in the record.

In 2005, Sila employed Fred Franklin, a licensed land surveyor, to survey and create a plat of his land. Franklin discovered that the centerline of the county road along the west side of Sila's property did not, in fact, as George and Eugene had believed, correspond to the section line. Franklin explained that while the county tries to build its roads to correlate to the section lines, this was not always possible, and that, in any event,

the centerline of roads can shift slightly over the years. Franklin did not notice either a stump or a well as visual markers of a boundary line. Franklin's survey demonstrates that the platted boundary of Sila's property lies east of the boundary claimed by Kirk.

Douglas Mordhorst, a registered land surveyor, was then hired by Kirk to survey the 18 acres in accordance with the stump and the well as boundary markers. With Elliotte's assistance, Mordhorst was able to pinpoint the location of these markers. Elliotte testified that since the dispute with Sila began, someone had covered the well with dirt such that it was no longer visible. Also, someone had dug up the stump and thrown it some distance away from its original location. Elliotte was able to retrieve the stump itself as evidence. He was able to find the stump's prior location by excavating its remainder from underground in the midst of a row of above-ground stumps along the north border of the properties. Because Elliotte was familiar with the location of the well, they were also easily able to excavate it.

Mordhorst's survey used the stump as the northeast corner and used the west edge of the well to reference the southeast corner, such that the entirety of the well was within Kirk's property. The survey also set forth the boundary of the property in accordance with its legal description, measuring from the actual section line on the west side. Mordhorst's and Franklin's surveys agree as to the boundary that correlates to the legal description of the property.

Mordhorst's survey illustrates the disputed area as a trapezoid that is narrower on the south end, encroaching approximately 5 fewer feet into the legally described 18 acres on the south end than on the north. The boundary Elliotte testified was recognized by George and Eugene thus did not run exactly parallel to the west road. Mordhorst testified that the printed exhibit representing the survey was not completely proportionate. Although the survey was to scale in the east-west direction, it was compressed in the north-south direction to fit onto a legal-sized sheet of paper. Mordhorst's survey established that there was a total of .264 of an acre in issue between the parties.

The district court ruled in favor of Sila, finding that Sila was the owner of the property in accordance with the boundary

described in the original plat. In its findings of fact, the court noted that while the aerial photograph showed the boundary as being parallel to the road, the exhibit representing Mordhorst's survey did not show a parallel line, and that thus, "it is not possible that the tract could be as Elliotte testified."

Furthermore, the court opined that as a matter of law, mutual acquiescence can only determine a boundary that is unknown. Since the true location of the boundary was set forth by the property's legal description and was readily ascertainable through conventional surveying techniques, the court concluded it was "known." Moreover, the court stated that Elliotte's mere opinion that the stump and well were a "demarcation of ownership" was insufficient to prove by a "preponderance of credible, competent evidence" that those markers were not simply considered by George and Eugene as a "temporary agreement" or "approximation" of the boundary. The court also rejected Kirk's adverse possession claim. Kirk appeals.

## ASSIGNMENTS OF ERROR

Kirk assigns, consolidated, that the district court erred in (1) determining that he had not established title to the disputed tract under the theory of mutual recognition and acquiescence, (2) holding that the filial relationship rule applies to his mutual recognition and acquiescence defense, and (3) failing to find that the stump and the well established the boundary line.

## STANDARD OF REVIEW

Actions brought under § 34-301 are in equity.[1] As such, we review the record de novo and reach an independent conclusion without reference to the conclusion reached by the trial court; except, however, that where credible evidence is in conflict, we give weight to the fact that the trial court saw the witnesses and observed their demeanor while testifying.[2]

## ANALYSIS

■ Under the doctrine of mutual recognition and acquiescence, while a boundary may be fixed in accordance with a

---

[1] *Spilinek v. Spilinek*, 215 Neb. 35, 337 N.W.2d 122 (1983).

[2] *Id.*

survey, when a different boundary is shown to have existed between the parties for the 10-year statutory period, it is that boundary line which is determinative and not that of the original survey.[3] We have explained: "'The rule long established in this jurisdiction is that where a boundary, supposed to be the true line established by the government survey, is acquiesced in by the adjoining owners for more than ten years, it is conclusive of the location.'"[4]

The district court, in concluding that the well/stump boundary was not established by mutual acquiescence, relied on *Hakanson v. Manders*[5] for the proposition that the doctrine is simply unavailable when a deed to the disputed land sets forth clearly a known and certain metes and bounds description. This has never been the law. In *Hakanson*, we quoted the following statement from American Jurisprudence:

"The cases approving the doctrine of acquiescence generally do not differentiate between cases where the boundary was uncertain or in doubt at the time it was first acquiesced in and cases where it was known and certain. However, in the second case, only adverse possession can avail the person claiming under the boundary so recognized."[6]

But, in *Lynch v. Egan*,[7] we rejected the landowner's argument that the boundary could not have been established by mutual recognition and acquiescence because the true line could have been ascertained by employing a county surveyor, stating: "[W]e do not understand the rule to be that in order that an agreement of that kind should be binding, the true line should be absolutely unascertainable."[8] As explained by the California

---

[3] See *Kraft v. Mettenbrink*, 5 Neb. App. 344, 559 N.W.2d 503 (1997). See, also, *Matzke v. Hackbart*, 224 Neb. 535, 399 N.W.2d 786 (1987); *Converse v. Kenyon*, 178 Neb. 151, 132 N.W.2d 334 (1965); *Romine v. West*, 134 Neb. 274, 278 N.W. 490 (1938).

[4] *Hausner v. Melia*, 212 Neb. 764, 772-73, 326 N.W.2d 31, 37 (1982) (emphasis omitted).

[5] *Hakanson v. Manders*, 158 Neb. 392, 63 N.W.2d 436 (1954).

[6] *Id.* at 396, 63 N.W.2d at 439, quoting 8 Am. Jur. *Boundaries* § 72 (1937).

[7] *Lynch v. Egan*, 67 Neb. 541, 93 N.W. 775 (1903).

[8] *Id.* at 546, 93 N.W. at 777.

Supreme Court in *Price v. De Reyes*,[9] in fact, "[i]t is only where the true location is subsequently ascertained that actions of this kind arise." Thus, in other mutual recognition and acquiescence cases, although not directly addressing this issue, we have affirmed a boundary by mutual recognition and acquiescence even though an ascertainable metes and bounds description was apparently described by deed.[10]

 In *Lynch*, we explained that what was important was that the true line was actually unknown and uncertain to the parties acquiescing in the boundary. The parties were free to forgo the expense and trouble of having a survey conducted and to agree upon a division line. As stated by another court, "the fact that an accurate survey is possible is not conclusive of the question whether a doubt exists as to the location of a boundary."[11] It is the uncertainty in the minds of the landowners of the line *on the ground* that is relevant to the ability to acquiesce to a boundary, not the uncertainty in the written description of the deed.[12] That the true boundary is "knowable" because the deed contains a metes and bounds description that a registered surveyor could have properly marked on the land—but did not—does not preclude the property owners from acquiescing in a boundary they believe corresponds with the deed's description.[13]

The court alternatively found that Kirk had failed to prove that the well/stump line was anything other than "an approximation of the line . . . on a temporary basis." We disagree. In our de novo review of the evidence, it is apparent that George and Eugene understood the boundary they had marked to be the permanent, actual boundary between the properties. The boundary was set after being carefully measured and marked. The fact that

---

[9] *Price v. De Reyes*, 161 Cal. 484, 489, 119 P. 893, 895 (1911).

[10] See, *Hausner v. Melia, supra* note 4; *Romine v. West, supra* note 3.

[11] *Kirkegaard v. McLain*, 199 Cal. App. 2d 484, 491, 18 Cal. Rptr. 641, 645 (1962).

[12] *Norwood v. Stevens*, 104 Idaho 44, 655 P.2d 938 (Idaho App. 1982).

[13] See, *Lynch v. Egan, supra* note 7; *Piotrowski v. Parks*, 39 Wash. App. 37, 691 P.2d 591 (1984); *Sanlando Springs Animal Hosp. v. Douglass*, 455 So. 2d 596 (Fla. App. 1984); *Wampler v. Sherwood*, 281 Or. 261, 574 P.2d 319 (1978); *Nunley v. Walker*, 13 Utah 2d 105, 369 P.2d 117 (1962).

there may have been error in the measurement, or even further error in the placement of the well, does not make the boundary established by the markers and recognized for 21 years thereafter a "temporary agreement" or "approximation."

The evidence is that the brothers, George and Eugene, farmed the land in opposite directions to keep their respective ownership clear. They each kept the profits from their respective crops. There is nothing in the record from which we could infer that George and Eugene simply did not care whether one of them was profiting off the other's land. Nor is there evidence that the boundary markers were not mutually recognized as the real boundary between the properties. Elliotte specifically testified that Eugene, his father, and George, his uncle, meant "[t]o split the farm up to get a boundary line so [George] knew what he owned and what my dad owned."

That one of the crimped pennies was replaced by a well that might not have exactly corresponded to the initial measurement is of little consequence, because the well was actually acquiesced to as the south boundary marker for the statutory period. The fence on the south side with the crimped penny was there only for 3 years, until 1965. Nothing in Elliotte's testimony indicates that from 1965 to 1989, the crop line dividing the two farms ever changed. And Elliotte was intimately aware of this boundary because he farmed the land with Eugene during this period. That a boundary line is, in fact, an approximation of the real boundary, does not preclude a finding of mutual recognition and acquiescence, so long as the acquiescing parties recognized this approximation as their actual boundary. Insofar as there appears to be a crop line parallel to the road in the 1966 aerial photograph, we do not, as the district court did, find this to be contradictory to Kirk's claim. We have no reason to believe that a 5-foot variance from the parallel, in the boundary of an 18-acre property, would be readily discernible in an aerial photograph that was obviously taken from a great distance.

Sila asserts that regardless of the other evidence, the filial relationship rule must defeat Kirk's claim. The filial relationship rule is recognized in adverse possession claims and establishes a rebuttable presumption that the use of the land was permissive

when the occupier of the land is a relative of the true owner.[14] This is relevant to claims of adverse possession because permissive use is inconsistent with the necessary element of hostility: that the true owner had actual or constructive notice that his or her title was in danger.[15] But, as noted recently by the Nebraska Court of Appeals in *Campagna v. Higday*,[16] the filial relationship rule has never been applied to a case involving a claim of mutual recognition and acquiescence. And the doctrine of mutual recognition and acquiescence does not rely on hostile possession—to the contrary, it depends on the landowners' agreement as to the boundary between their properties. We conclude that the filial relationship rule has no bearing on a mutual recognition and acquiescence analysis.

Finally, Sila argues that the evidence of the mutual recognition and acquiescence is insufficient because Kirk only presented his own testimony and that of his brother, Elliotte, who, Sila asserts, is biased in Kirk's favor. Sila points out that there was no testimony from neighbors or other witnesses to confirm Elliotte's and Kirk's testimony.

In order for mutual recognition and acquiescence to operate, there must be an assent, by words, conduct, or silence, in a line as the boundary.[17] Elliotte's and Kirk's testimony established such conduct by a preponderance of the evidence. We will not discredit the testimony of Elliotte merely because he is Kirk's brother, just as we do not discredit Kirk's testimony merely because he is a party to the action. And the conduct of the various landowners between 1962 and 1989, established by physical evidence, substantiates Elliotte's and Kirk's testimony. It was Sila's burden to bring forth conflicting testimony if he thought it existed. As the record is presented to us, we find little dispute that George and Eugene in fact mutually recognized and acquiesced to the boundary represented in Mordhorst's survey, and we so find. Having found that the boundary was established

---

[14] See, e.g., *Petsch v. Widger*, 214 Neb. 390, 335 N.W.2d 254 (1983).

[15] *Wanha v. Long*, 255 Neb. 849, 587 N.W.2d 531 (1998).

[16] *Campagna v. Higday*, 14 Neb. App. 749, 714 N.W.2d 770 (2006).

[17] See *Spilinek v. Spilinek, supra* note 1.

by mutual recognition and acquiescence, we need not address Kirk's alternative theory that the boundary was established by adverse possession.

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the district court, and remand the cause with directions to enter judgment in favor of Kirk and to set the boundary between the properties in accordance with the stump and well markers as represented in the Mordhorst survey.

REVERSED AND REMANDED WITH DIRECTIONS.