Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/10/2021 08:09 AM CDT

Bush Island, Inc., appellant, v. Ronald H.
and Gloria Kortum et al., appellees.

___ N.W.2d ___

Filed August 3, 2021.    No. A-20-391.

1. **Equity: Actions: Boundaries.** An action to ascertain and permanently establish corners and boundaries of land under Neb. Rev. Stat. § 34-301 (Reissue 2016) is an equity action.

2. **Equity: Appeal and Error.** In an equity action, an appellate court reviews the record de novo and reaches an independent conclusion without reference to the conclusion reached by the trial court, except that where credible evidence is in conflict, the appellate court will give weight to the fact that the trial court saw the witnesses and observed their demeanor while testifying.

3. **Trial: Expert Witnesses: Appeal and Error.** A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion.

4. **Property: Waters: Boundaries.** The ownership of an island carries with it the bed of the river to the center or thread of each surrounding channel.

5. ____: ____: ____. Where title to an island, bounded by the waters of a nonnavigable stream is in one owner, and title to the land on the other shores opposite the island is in other owners, the same riparian rights appertain to the island as to the mainland.

6. **Waters: Boundaries: Words and Phrases.** The thread, or center, of a channel is the line which would give the landowners on either side access to the water, whatever its stage might be and particularly at its lowest flow.

7. **Waters: Quiet Title: Proof.** A party who seeks to have title in real estate quieted in him or her on the ground that it is accretion to land to which that party has title has the burden of proving the accretion by a preponderance of the evidence.

8. **Waters: Words and Phrases.** Accretion is the process of gradual and imperceptible addition of solid material, called alluvion, thus extending the shoreline out by deposits made by contiguous water.

9. **Boundaries: Waters: Title.** Where title to an island in a nonnavigable stream is conveyed by grantee by government patent, and the land so conveyed is bounded by the waters of such stream, the grantee's ownership carries with it the bed of the river to the center of the thread of each surrounding channel.

10. **Boundaries: Time.** Under the doctrine of mutual recognition and acquiescence, while a boundary may be fixed in accordance with a survey, when a different boundary is shown to have existed between the parties for the 10-year statutory period, it is that boundary line which is determinative and not that of the original survey.

11. **Boundaries.** To claim a boundary line by acquiescence, both parties must have knowledge of the existence of a line as the boundary. It is insufficient for one party to merely establish a line and take possession up to that line.

12. ____. For acquiescence to operate, the other party must assent, by words, conduct, or silence, to a line as the boundary.

13. ____. In order to establish a boundary by acquiescence, it is not necessary that the acquiescence should be manifested by a conventional agreement, but recognition and acquiescence must be mutual, and both parties must have knowledge of the existence of a line as a boundary line.

14. **Pleadings: Appeal and Error.** Permission to amend a pleading is addressed to the discretion of the trial court, and an appellate court will not disturb the trial court's decision absent an abuse of discretion.

Appeal from the District Court for Merrick County: JAMES C. STECKER, Judge. Affirmed.

Stephen D. Mossman and Jacob C. Garbison, of Mattson Ricketts Law Firm, for appellant.

David A. Jarecke and Ellen C. Kreifels, of Blankenau, Wilmoth & Jarecke, L.L.P., and Charles W. Campbell, of Angle, Murphy & Campbell, P.C., L.L.O., for appellees.

RIEDMANN, BISHOP, and WELCH, Judges.

RIEDMANN, Judge.

## INTRODUCTION

Bush Island, Inc., commenced this action to establish boundary lines and to quiet title to certain property in its favor and against Ronald H. Kortum, Gloria Kortum, Jacqueline Drummond, Duane Drummond, Kathleen Fowles, Bradley Lockenvitz, Sarah Lockenvitz, John Lockenvitz, Norman Krug, and Sue Ellen Krug (collectively the defendants). The defendants joined John Allen, Tamara Allen, Kenneth L. Vettel, the Larry L. Sands Revocable Trust, the Nancy J. Sands Revocable Trust, and Bruce W. Rodabaugh (collectively the cross-defendants) in the action as adjacent landowners. After trial, the district court for Merrick County dismissed Bush Island's claims and found in favor of the defendants and cross-defendants as to their claims. Bush Island appeals.

## BACKGROUND

This case involves disputes over land located on an approximately 4-mile stretch of the Platte River. The parcels of land at issue here are generally located throughout Sections 10, 11, 14 through 17, 20, and 21, Township 12 North, Range 7 West of the 6th P.M., primarily in Merrick County, Nebraska, but partially extending into Hamilton County, Nebraska. Bush Island owns two surveyed islands within the Platte River, known as Islands 5 and 6, and all accretions thereto. The defendants own various parcels of land located to the north and west of Islands 5 and 6, and the cross-defendants own parcels of land located to the south and west of Islands 5 and 6.

In 2014, Bush Island applied for and received approval to participate in a federal restoration program with the Natural Resources Conservation Service (NRCS). The application raised questions of property boundaries, but ultimately, the defendants did not challenge Bush Island's application. Subsequently, Bush Island expanded its application and applied for a second federal project for additional compensation. The defendants and cross-defendants objected to the expanded property

boundaries that Bush Island proposed in this application. Thus, thereafter, Bush Island filed a petition in equity, pursuant to Neb. Rev. Stat. § 34-301 (Reissue 2016), to establish the corners and boundaries of its property, quiet title to said property in Bush Island, and enjoin the defendants and cross-defendants from asserting any claim of interest in its property. It asserted that it acquired ownership to additional lands through the process of accretion.

The defendants initially filed an answer and "crossclaim," joining the cross-defendants into the action as adjacent property owners. Prior to trial, the defendants filed an amended answer and cross-claim, which raised the issue of mutual recognition and acquiescence of a boundary. Specifically, they alleged that the defendants and Bush Island, or their respective predecessors in interest, mutually agreed upon a fence as a boundary between their properties. Although the defendants' pleading was titled as an amended answer and "crossclaim," it requested that the court establish the boundary line as to "all indispensable parties." During trial, the defendants sought and received leave to file a second amended answer and "counterclaim," raising the issues of boundary by acquiescence as well as an adverse possession claim.

Trial was held over the course of 8 days in October and November 2019. The record from trial is voluminous, consisting of more than 1,600 pages of testimony and over 180 exhibits. According to the evidence presented at trial, the U.S. General Land Office (GLO) was established by the "Land Ordinance of 1785" and tasked with identifying, surveying, and platting public lands. The GLO surveyed the portion of the Platte River at issue in this case in the 1860's, mapping its meander corners and locating certain island masses within the river. At that time, the GLO had a policy of surveying only islands with an above-water surface area of at least 5 acres, so when it surveyed this stretch of the river in 1866, the GLO identified only three islands within the river, which were known as Islands 5, 6, and 7.

After completion of the GLO surveys, Islands 5 and 6 merged into a larger island landmass, to which Bush Island acquired the deed in 1961. Island 7 has merged into the south bank and is no longer a separately identifiable landmass. In addition, the channel banks have substantially changed since the original GLO survey, resulting in significantly more landmass located between the banks than that which existed in 1866. As a result, given the hydrologic and geomorphologic conditions of this reach of the Platte River, the physical land claimed by all of the parties has gradually changed since their original conveyances.

There are three primary river channels in this area that have been identified. They are the north channel, which separates at a certain point in Section 16 into a north branch and a south branch before they rejoin downstream; the middle channel; and the south channel. Bush Island sought to quiet title to all property from the north branch of the north channel to the south channel, and beginning at the "Chapman Bridge" in Section 20 on the west extending to a fence on the east, as depicted in a survey received into evidence as exhibit 202.

Dr. Robert Mussetter is a hydraulic engineer with more than 40 years' experience in river engineering and fluvial geomorphology. His work involves analyzing the quantities, timing, and behavior of riverflow; the hydraulic conditions thereof; the riverflow water's interaction with boundary materials, erosion, and sedimentation processes; and other things that affect the behavior of rivers. For this case, the cross-defendants hired Mussetter to determine the extent of any accretion ground that could be attributed to them and to Bush Island, as well as to locate the main thread of the river in this stretch of the Platte River.

Mussetter defined several terms that he used throughout his testimony and report. He explained that according to the "Federal Manual of Survey Instructions," an island is defined as a body of land that is completely surrounded by water when the water is at the ordinary high water mark. Upland is the

area above the ordinary high water mark or, in other words, the solid ground above the water's surface. Ordinary high water mark is a term used to identify the boundary between the bed of the channel and the upland, and the channel is the portion of the river below the ordinary high water mark. Accretion is the gradual buildup of lands, either in or along a river, primarily through the deposit of sediment.

In order to determine the extent of the accretion ground that Bush Island could properly claim, Mussetter examined the original GLO survey and aerial photographs of this stretch of the river dating back to 1938 and overlaid the historical photographs with current photographs of the area. He observed how the original islands evolved over time and identified the location of the channels and ordinary high water mark around the boundaries of the ground. Mussetter explained that the bed of the middle channel is and has historically been below the ordinary high water mark, which defines it as a channel. Thus, he concluded that the middle channel is and has been an active channel and that it has been in approximately the same location since 1938. In his report, he added that the middle channel most likely also persisted during the period between the GLO survey in 1866 and the 1938 aerial photograph. Therefore, he opined that the middle channel forms the northern boundary of Bush Island's accretion claim.

Mussetter additionally identified the south channel as the south boundary of Bush Island's accretion ground. He further determined that the west boundary of Bush Island's accretion ground was the junction of the middle and south channels. In sum, Mussetter opined that Bush Island's accretion claim was limited to the north by the middle channel, to the south by the south channel, and to the west by the junction of the middle and south channels.

With regard to the thread of the river, Mussetter defined the thread of a river as the part of the river that is the last to dry up. He was asked whether there is a difference between the thread of a river and a river channel, and he explained that

the thread of the river is one specific part of the river channel, but that there can be multiple channels in the river, as in this case. Mussetter determined that the primary thread of the river here was in the north channel and that the secondary thread was in the south channel.

Thomas Riley, a civil engineer whose work focuses on hydrology, streamflow, and watershed runoff, was hired by the defendants to review the hydrology and hydraulics of this stretch of the Platte River. He followed a process similar to Mussetter's by overlaying historical photographs with current photographs and observed that the primary channels have remained virtually unchanged since 1938. Riley opined that the middle channel was an active channel from 1938 through the present.

There was also evidence presented at trial relating to a fence that runs along the eastern edge of Bush Island's property, turns west and runs along the south branch of the north channel, and then curves south in Section 16. In their amended answer and cross-claim, the defendants asserted that this fence forms a mutually agreed-upon boundary between their land and that of Bush Island, despite some of the land's being located north of the middle channel.

The construction of the fence began with a 1938 survey by Oscar Parsons, the Merrick County surveyor at the time. The field notes to the survey provide that Uriah Bush, the owner of Bush Island at that time, and Henry Kortum, the neighboring landowner, requested that Parsons "run accretion lines," and he did so in Sections 15, 16, and 21. Ultimately, the fence was built to be consistent with Parsons' survey.

In 1940, Parsons completed a survey to run accretion lines for the part of Island 5 lying in Section 12 at that time. Pursuant to that survey, a fence was built between Bush Island and its neighbor to the east. There is no dispute that this fence forms the eastern boundary of Bush Island.

In late 2013 or early 2014, at the direction of John Cates, a Bush Island shareholder at the time, licensed land surveyor

Kelly Stevens resurveyed the fence. Stevens explained that Cates drove him around the area and that wherever there was a transition, turn, angle, or change in the fence, he took GPS coordinates. Once he completed the fieldwork, Stevens compiled the information into an aerial map, which was received into evidence as exhibit 186. Stevens also incorporated this information into exhibit 241, a survey that was created for Bush Island's 2014 NRCS application using the fence line as its north and west boundary lines.

Around that same time, the Merrick County assessor's office began evaluating its taxation assessment boundary lines. In early 2014, Merrick County property owners were given the option of providing information to the assessor's office to assist in redrawing the assessment lines. Jennifer Myers is the current Merrick County assessor, but she worked as a clerk in the assessor's office in 2014. Myers testified that Cates approached her in 2014 on behalf of Bush Island and told her that although the west fence had been recognized by the surrounding property owners as the boundary line, Cates wanted the boundary line to be relocated as a result of a survey that had been completed in 2012. Ronald Kortum informed her that the fence line had been an established boundary line between the property owners dating back to 1965, and Bradley Lockenvitz provided similar information that the north fence was the boundary line. As a result of the information the assessor's office received, the assessment boundary lines were redrawn using the north and west fence lines as boundary lines.

Following trial, the district court entered a written order. The court found that Bush Island's accretion claim was limited to the channels that surround Islands 5 and 6. It noted that the original Islands 5 and 6 were located between the middle channel and the south channel and determined that the middle channel was an active channel below the ordinary high water mark; thus, the ground north of the middle channel could not be included as part of accretion ground that may be claimed by Bush Island. According to the district court, it

was clear that accretion had added to the area of Islands 5 and 6; however, the legal description that Bush Island provided to the court was greater than the accretion the court deemed properly includable, because Bush Island sought accretion land north to the north channel. As a result, the court held that Bush Island failed to prove the boundaries of the accretion that it alleged in its complaint, and therefore, it dismissed Bush Island's claims.

With regard to the defendants' claims, the district court held that the parties recognized the fence as a mutually recognized boundary for a period greater than 10 years. The court noted that in 1938, Parsons was commissioned to run accretion lines and that there was no evidence or claim that Uriah Bush lacked notice or knowledge of the survey. Subsequent to the survey, the fence was constructed and maintained for more than 75 years, and it not only separated cattle, but also served as an undisputed boundary fence until Bush Island filed this lawsuit. Thus, the court found that the north and west fence was a boundary fence between Bush Island's and the defendants' properties and that as a result, Bush Island's accretion claim was limited to the south and east of the fence as depicted in exhibit 186. Accordingly, the district court established the boundary line between Bush Island, the defendants, and the cross-defendants as consistent with exhibit 241.

Finally, the court awarded certain island property, referred to as "Islands 1 through 8," to the Kortums and awarded certain accretion land located to the south and west of Islands 5 and 6 to the Allens and to the Larry L. Sands Revocable Trust and the Nancy J. Sands Revocable Trust (collectively Sands).

Bush Island filed a motion to alter or amend, which the district court denied. Bush Island timely appeals.

## ASSIGNMENTS OF ERROR

Bush Island assigns, restated and renumbered, that the district court erred in (1) allowing Mussetter to testify as an expert as to matters of law; (2) holding that Bush Island was

required to determine the ordinary high water mark of the channels surrounding its property in order to prevail on its accretion claim; (3) holding that the middle channel has persisted through time; (4) holding that the middle channel forms the northern boundary of Bush Island's accretion claim; (5) holding that Bush Island failed to prove its accretion claim; (6) holding that Bush Island recognized the existence of a boundary fence for a period greater than 10 years; (7) finding that Bush Island's accretion claim is limited to the south and east of the fence as depicted in exhibit 186; (8) considering exhibit 211 as evidence of an agreement as to the disposition of real property; (9) holding that the defendants and cross-defendants met their burdens to prove their boundaries; (10) finding that Islands 1 through 8 separately existed and have been recognized as separate islands for over 100 years; (11) finding that the Kortums acquired title to Islands 1 through 8; (12) considering exhibit 205; (13) admitting exhibit 215; (14) allowing a witness to testify that certain ovals depicted on exhibits 34, 391, and 392 were "the same"; (15) admitting page 4 of exhibit 244; (16) holding that "the Act of August 3, 1846, as amended by the Isolated Tract Act of February 26, 1895[,] provided for the sale of unsurveyed islands"; (17) permitting the defendants to amend their counterclaim at trial; (18) finding that the Allens and Sands acquired land by adverse possession; (19) finding that the Allens and Sands are entitled to the accretion north of the south channel; and (20) granting the Allens accretion to land not at issue at trial.

## STANDARD OF REVIEW

[1,2] An action to ascertain and permanently establish corners and boundaries of land under § 34-301 is an equity action. *Babel v. Schmidt*, 17 Neb. App. 400, 765 N.W.2d 227 (2009). In an equity action, an appellate court reviews the record de novo and reaches an independent conclusion without reference to the conclusion reached by the trial court, except that where credible evidence is in conflict, the appellate court will

give weight to the fact that the trial court saw the witnesses and observed their demeanor while testifying. *Id*.

## ANALYSIS

*Mussetter's Testimony.*

Bush Island first assigns that the district court erred in allowing Mussetter to testify as an expert as to matters of law. More specifically, Bush Island claims that Mussetter was permitted to provide his legal opinion as to the extent of Bush Island's accretion claim, which the district court then relied upon to limit Bush Island's accretion claim north to the middle channel, rather than the north channel as Bush Island suggested.

[3] Generally, a trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion. *Woodmen of the World v. Nebraska Dept. of Rev.*, 299 Neb. 43, 907 N.W.2d 1 (2018). We find no abuse of discretion in the admission of Mussetter's testimony here.

To support its position, Bush Island directs our attention to *Sasich v. City of Omaha*, 216 Neb. 864, 347 N.W.2d 93 (1984). There, in dicta, the Nebraska Supreme Court criticized the trial court for admitting expert testimony from a legal scholar on the status of zoning laws. The Supreme Court observed that while our rules of evidence allow for expert testimony, that testimony must be such as to assist the trier of fact to understand the evidence or to determine a fact issue, and generally, expert testimony concerning the status of the law accomplishes neither of these goals. See *id*. Thus, such evidence is irrelevant and inadmissible. See *id*.

The common thread in *Sasich v. City of Omaha, supra*, and its progeny is that the proferred testimony was offered by a legal scholar or the contents of the challenged testimony related to the interpretation of the law. See, also, *Woodmen of the World v. Nebraska Dept. of Rev., supra* (upholding exclusion of testimony of tax law professor regarding statutory construction and his research and study of law in Nebraska);

*State v. Merchant*, 285 Neb. 456, 827 N.W.2d 473 (2013) (reversing and remanding for new trial due to erroneous admission of expert testimony interpreting statute and opining that defendant's actions violated statute); *Sports Courts of Omaha v. Brower*, 248 Neb. 272, 534 N.W.2d 317 (1995) (finding trial court erred in receiving opinion testimony of law professor concerning status of law); *Kaiser v. Western R/C Flyers*, 239 Neb. 624, 477 N.W.2d 557 (1991) (declining to consider expert testimony as to interpretation of zoning ordinance).

In the present case, however, Mussetter's testimony did not put forth his interpretation of the law for the court's consideration. Instead, he acknowledged reviewing relevant case law in Nebraska in order to apply his scientific knowledge to concepts such as accretion and the thread of the stream, which are defined under Nebraska law. Thus, contrary to the cases Bush Island relies upon, Mussetter did not provide expert testimony as to his interpretation of the law or the status of the law; rather, he provided his scientific expertise within his understanding of the confines of Nebraska law.

To this end, at trial, Mussetter testified that in performing his work for this case, he considered the principles and definitions from published court cases and explained that doing so was important because it provided the source of authority and definitions that he then tied to his technical understanding of the river to help identify the features in the river that are pertinent. Mussetter set forth in his report that he was asked to perform three specific tasks related to identification of the accretion boundaries of Bush Island's property. His report notes that the question of whether Bush Island's accretion claim was valid hinges on whether all of the claimed upland beyond the boundaries of the originally surveyed islands was formed through accretion to the original islands or whether portions of this land are actually separate islands that formed subsequently to the original survey.

Mussetter was aware that the defendants claimed ownership of certain property north of Bush Island, and he confirmed

that he was not expressing any opinion of ownership regarding any disputed grounds; rather, he was simply defining the extent of the accretion claim that may legitimately be claimed. His report additionally cautions that there may be other reasons to limit the upstream extent of Bush Island's property and notes that he did not make any legal determinations regarding ownership of any property that may be affected by any instruments of title or other documents that are subject to question or dispute by the parties.

In its amended complaint, Bush Island asked the district court to establish the boundaries of its property and quiet title to said property in Bush Island. Mussetter did not opine as to Bush Island's ownership of any portion of property. Rather, he explained whether the land Bush Island sought met the scientific definition of accretion and outlined the limits of Bush Island's accretion claim due to the surrounding channels according to Nebraska law. In other words, Mussetter detailed the extent of land that Bush Island could claim as accretion ground, but did not opine as to whether Bush Island proved that it was entitled to ownership of that land. The testimony he provided assisted the district court in determining the ultimate fact issue of whether the lands Bush Island claimed were properly defined as accretion land. See *Burket v. Krimlofski*, 167 Neb. 45, 91 N.W.2d 57 (1958) (question of fact as to whether accretion land belonged to defendants or plaintiffs).

Furthermore, even though the district court agreed with Mussetter's conclusions as to the extent of land that Bush Island could claim as accretion land, that was not the end of the court's inquiry into the issue of ownership boundaries, because the defendants and cross-defendants raised claims of adverse possession, mutual recognition and acquiescence, and ownership by deed. Thus, because Mussetter did not opine on the status or interpretation of the law and his testimony assisted in determining a fact issue, we disagree that Mussetter's testimony constituted an impermissible legal opinion. Therefore,

the district court did not abuse its discretion in allowing Mussetter's testimony.

*Bush Island's Accretion Claim.*

Next, Bush Island generally argues that the district court erred in holding that it failed to prove its accretion claim. Specifically, Bush Island asserts that the court erred in finding that Bush Island was required to determine the ordinary high water mark of the channels surrounding its property, that the middle channel has persisted through time, and that the middle channel forms the northern boundary of its accretion claim. We reject these arguments.

[4-6] There is no dispute that Bush Island is the title owner of Islands 5 and 6. In this state, the owner of an island has title to any land between that island and the center of each surrounding channel. See *Winkle v. Mitera*, 195 Neb. 821, 241 N.W.2d 329 (1976). The ownership of an island carries with it the bed of the river to the center or thread of each surrounding channel. *Id*. Where title to an island, bounded by the waters of a nonnavigable stream is in one owner, and title to the land on the other shores opposite the island is in other owners, the same riparian rights appertain to the island as to the mainland. *Id*. The thread, or center, of a channel is the line which would give the landowners on either side access to the water, whatever its stage might be and particularly at its lowest flow. *Babel v. Schmidt*, 17 Neb. App. 400, 765 N.W.2d 227 (2009). In other words, the thread of the stream is the deepest groove or trench in the bed of a river channel, the last part of the bed to run dry. *Id*.

[7,8] A party who seeks to have title in real estate quieted in him or her on the ground that it is accretion to land to which that party has title has the burden of proving the accretion by a preponderance of the evidence. *Curry v. Furby*, 20 Neb. App. 736, 832 N.W.2d 880 (2013). Accretion is the process of gradual and imperceptible addition of solid material, called alluvion, thus extending the shoreline out by deposits made by contiguous water. See *id*.

In the present case, Mussetter and Riley each explained that there are three main channels of the Platte River in the area where Islands 5 and 6 are located: the north channel, the middle channel, and the south channel. Bush Island alleged that the north channel formed the northern boundary of its accretion land because the thread of the river was located in the north channel. The district court, however, determined that the northern boundary of Bush Island's accretion claim was the middle channel and that the middle channel was an active channel that had persisted over time.

Bush Island asserts that the district court erred in holding that Bush Island was required to determine the ordinary high water mark of the channels surrounding its property in order to establish the boundaries of its accretion claim. The point of the ordinary high water mark is relevant and important because, as Mussetter explained, an island is defined as a body of land that is completely surrounded by water at the ordinary high water mark. He further explained that a river channel is the portion of the river located below the ordinary high water mark and that upland is land that exists above the ordinary high water mark. Thus, because the owner of an island has title to any land between the island and the center of each surrounding channel, it is necessary to identify the ordinary high water mark in order to define and locate the channels that surround the island.

As depicted on historical aerial photographs, the original location of Islands 5 and 6 was bounded by the middle channel to the north and the south channel to the south. The district court relied upon the opinions of Mussetter and Riley to determine that the middle channel has persisted over time. Mussetter and Riley each examined aerial photographs dating back to 1938 and overlaid the historical photographs with current photographs of the area; in doing so, they each concluded that the middle channel is and has been an active channel that has been in approximately the same location throughout that time period. Mussetter additionally concluded that the middle

channel most likely persisted during the period between the GLO survey in 1866 and the 1938 aerial photograph.

In our de novo review of the record, we give weight to the fact that the district court credited Mussetter's and Riley's conclusions, and we observe that a review of the historical aerial photographs confirms the conclusions reached by Mussetter and Riley. Bush Island argues, however, that whether the middle channel persisted over time is irrelevant to determine the boundaries of Bush Island's accretion claim, asserting that the northern boundary should lie in the north channel rather than the middle channel. Although we agree that the evidence supports a finding that the primary thread of the stream is located in the north channel, and that conclusion is not challenged on appeal, we disagree that this mandates a finding that the north channel establishes the northern boundary of Bush Island's accretion land.

[9] Where title to an island in a nonnavigable stream is conveyed by grantee by government patent, and the land so conveyed is bounded by the waters of such stream, the grantee's ownership carries with it the bed of the river to the center or thread *of each surrounding channel*. *Heider v. Kautz*, 165 Neb. 649, 87 N.W.2d 226 (1957) (emphasis supplied). The thread or center of a channel must be the line which would give the owners on either side access to the water, whatever its stage might be, and particularly at its lowest flow. *Id*.

We do not read this definition as requiring that the owners on each side of a nonnavigable stream have access to water at the lowest point in the entire surrounding area, when the area consists of multiple channels. Rather, as explained in *Heider v. Kautz, supra*, ownership extends to the center, or thread, of each channel surrounding an island property, not necessarily to the primary thread of the stream in the area. Mussetter explained that the thread of the river is one specific part of the river channel, the part that would be last to go dry, and that there can be multiple channels in the river, as in this case. Here, the channels that surround Islands 5 and 6, historically

and currently, are the middle channel and the south channel. Thus, the focus is on ensuring that owners on either side of these two channels have access to the water, even at its lowest flow, because they are the channels that border the island.

Furthermore, by definition, accretion extends the shoreline of land out by deposits made by *contiguous* water. See *Curry v. Furby*, 20 Neb. App. 736, 832 N.W.2d 880 (2013). Black's Law Dictionary defines "contiguous" as "[t]ouching at a point or along a boundary." Black's Law Dictionary 386 (10th ed. 2014). The waters contiguous to Islands 5 and 6 are the middle channel and south channel. These are the channels that therefore define the boundaries of Bush Island's accretion claim. Accordingly, the district court properly held that Bush Island's accretion land is limited to the north by the middle channel and to the south by the south channel.

Bush Island relies on *Winkle v. Mitera*, 195 Neb. 821, 241 N.W.2d 329 (1976), to argue that land does not have to be attached to be properly held to be accretive land for the owner of an island. In that case, however, the plaintiff's predecessor in interest owned Giger Island and there was initially nothing but water between the island and the surrounding channel. Thus, when a new island arose in the channel waters, the plaintiff was the rightful owner of it, even though it was not physically attached to Giger Island, because it was located in an area in which the plaintiff had an ownership interest: the area between Giger Island and the thread of the surrounding channel.

The present case is distinguishable because, although Bush Island's ownership interest extends north from Islands 5 and 6 to the middle channel, it does not go beyond that point, because the middle channel also formed the northern boundary of Islands 5 and 6 at the time Bush Island acquired its ownership interest. Bush Island seeks title to land north of the middle channel which is not attached to Islands 5 and 6 and is not located in an area in which Bush Island has an ownership interest. Thus, any land located beyond the middle channel to the north or the south channel to the south is not properly

classified as accretion to Islands 5 and 6. The district court therefore did not err in declining to quiet title in Bush Island to all of the land it sought in the amended complaint under a theory of accretion. And because Bush Island failed to prove the boundaries of the accretion that it alleged, the court correctly denied Bush Island's claims and dismissed its complaint.

*Issues Related to Defendants.*

Bush Island raises several issues with regard to the district court's findings as to the defendants. Bush Island generally argues that the court erred in concluding that the defendants met their burden of proving the existence of a boundary fence by mutual recognition and acquiescence and in awarding title to Islands 1 through 8 to the Kortums. Bush Island also challenges the district court's decision granting leave to the defendants to amend their answer and counterclaim during trial. We first address issues related to the fence.

As explained above, the fence runs along the eastern edge of Bush Island's property, turns west and runs along the south branch of the north channel, and then turns south in Section 16, running in a curved manner until approximately the south channel, where it turns and begins to run northeast again. The district court utilized the north and west portions of the fence to establish the boundary between the defendants and Bush Island.

[10] Under the doctrine of mutual recognition and acquiescence, while a boundary may be fixed in accordance with a survey, when a different boundary is shown to have existed between the parties for the 10-year statutory period, it is that boundary line which is determinative and not that of the original survey. *Sila v. Saunders*, 274 Neb. 809, 743 N.W.2d 641 (2008). See, also, § 34-301. The rule long established in this jurisdiction is that where a boundary, supposed to be the true line established by the government survey, is acquiesced in by the adjoining owners for more than 10 years, it is conclusive of the location. *Sila v. Saunders, supra.*

[11-13] To claim a boundary line by acquiescence, both parties must have knowledge of the existence of a line as the boundary. *Madson v. TBT Ltd. Liability Co.*, 12 Neb. App. 773, 686 N.W.2d 85 (2004). It is insufficient for one party to merely establish a line and take possession up to that line. *Id.* For acquiescence to operate, the other party must assent, by words, conduct, or silence, to a line as the boundary. See *id.* In order to establish a boundary by acquiescence, it is not necessary that the acquiescence should be manifested by a conventional agreement, but recognition and acquiescence must be mutual, and both parties must have knowledge of the existence of a line as a boundary line. *Id.*

In the present case, the fence was constructed pursuant to the 1938 and 1940 surveys by Parsons. Bush Island admits that the east portion of the fence forms its eastern boundary, despite the fact that the east fence is a continuous fence that was constructed in the same timeframe as the north fence and surveyed by the same surveyor. The fact that Parsons completed these surveys and that fences were constructed according to the surveys is uncontroverted. What is disputed, however, is whether Bush Island acquiesced to the north and west fences as the boundary separating its property from that of the defendants.

The evidence is clear that the defendants considered the fence to be the boundary between their properties and Bush Island's. Ronald Kortum, Bradley Lockenvitz, Samuel Krug, and Norma Krug each testified as to their understanding, dating back decades, that the fence was the boundary line. Ronald Kortum explained that as far back as 1984, he always recognized the fence as the boundary of his land. Bradley Lockenvitz, who was born in 1951, explained that he "would say that the neighborhood has lived by [the 1938] survey [boundaries] all of [his] life." He recalled his grandfather told him that the other side of the fence was Bush Island's property. Likewise, Norman Krug testified that his father told

him not to cross the fence because the property on the other side belonged to Bush Island.

The defendants additionally described utilizing their land as far south as the fence in various manners such as grazing cattle, hunting, fishing, and camping and asserted that no one from Bush Island ever objected to their doing so. Norman Krug testified that he was not aware of any claims by Bush Island that it owned any land north of the fence line and that between 1955 and 2010, he never encountered anyone from Bush Island on his portion of the land. Norman Krug also recalled, dating back to 1965, that his father grazed cattle north of the fence and that Bush Island had cattle south of the fence. Similarly, Bradley Lockenvitz detailed his use of his family's land as a teenager and young adult, venturing as far south as the fence. He recalled walking west along the north fence and that at some point, the fence crosses the south branch of the north channel, so he could walk up the channel because it was then located north of the fence on what he considered to be his family's property.

There was also evidence presented that would support a finding that Bush Island knew of and acquiesced to the fence as its northern and western boundary. Cates' son, a current Bush Island shareholder, testified that he went with his father to locate and identify the north fence during the pendency of these proceedings. He and his father knew of and had no dispute about the location of the fence. Cates explained in his deposition that he helped maintain the west fence in the 1960's and 1970's. He admitted that the fence helped keep his cattle in and that he "ran cattle" until 1977 everywhere east of the west fence. Over the last 50 years, Bush Island erected numerous deer huts or hunting huts on its property, but did not locate any huts north of the north fence. In addition, Bush Island used the fence line as its north and west boundary lines in its 2014 NRCS application. Around that same time, relying on information provided by Cates and the defendants, the Merrick County assessor's office redrew the assessment

boundary lines between Bush Island and the defendants based on the north and west fence lines.

Bush Island admits that the east fence constitutes a boundary line between it and its eastern neighbor and that this portion of the fence was constructed around the same time as the north and west portions and is contiguous to the remainder of the fence. The current president of Bush Island acknowledged his awareness of the east, north, and west fences and the fact that there are surveys that correspond to the location of the entire fence. Moreover, the defendants have utilized their parcels of land as far south as the fence line for decades without objection from Bush Island. We conclude that the foregoing evidence establishes that Bush Island recognized and acquiesced to the fence as a boundary line for more than 10 years.

We recognize, as Bush Island highlights, that there is evidence in the record that would support a finding that Bush Island did not consider the fence to be a boundary line. The district court also recognized this controversy, finding some of Bush Island's evidence and arguments to be "remarkable," inconsistent, and not credible. Because the credible evidence is in conflict, we give weight to the fact that the district court saw the witnesses and observed their demeanor while testifying and found the defendants' evidence to be more credible and persuasive. See *Babel v. Schmidt*, 17 Neb. App. 400, 765 N.W.2d 227 (2009). We therefore find that the district court did not err in establishing the fence as the boundary line between Bush Island and the defendants by mutual recognition and acquiescence.

Bush Island additionally asserts that it was the defendants' burden to prove that the 1938 survey and accompanying field notes represented a boundary agreement or mutual acquiescence. In our view of the evidence, it is not the survey itself that constitutes a boundary agreement. Rather, Uriah Bush and Henry Kortum requested the survey, Parsons completed it, and then a fence was built pursuant to the boundaries established by the survey. The 1940 survey followed a similar procedure.

Thereafter, the parties were aware of the existence and location of the fence. For acquiescence to operate, the other party must assent, by words, conduct, or silence, to a line as the boundary. See *Madson v. TBT Ltd. Liability Co.*, 12 Neb. App. 773, 686 N.W.2d 85 (2004). Bush Island's words in 2014 leading the Merrick County assessor's office to use the fence as its assessment boundary line, conduct of remaining to the east and south of the fence, and use of the fence as a boundary line in its NRCS application, as well as its silence in not objecting to the defendants' utilizing land as far south as the fence line, support a finding that Bush Island acquiesced to the fence as a boundary line. Thus, the defendants need not establish that the survey itself constituted a boundary agreement.

Finally, with regard to the fence, Bush Island contends that the defendants failed to meet their burden to establish the boundary line. Specifically, Bush Island argues that exhibit 241, the survey the defendants presented and upon which the court relied to establish the boundary, is not consistent with the 1938 survey and does not accurately depict the fence. We disagree.

Although it was the 1938 survey that originally led to construction of the fence, Stevens resurveyed the fence in late 2013 or early 2014 at the direction of Cates, including the north and west portions, and depicted those survey lines on exhibit 186. Stevens testified that in addition to the information he gathered in the field, he utilized the 1938 survey to create exhibit 186 and depicted the fence line with a pink line. With regard to any differences between exhibit 186 and the 1938 survey, Stevens explained that the 1938 survey helped him locate the corners of the fence and that he retraced some of the lines from the 1938 survey to identify the fence line.

Stevens also incorporated this information into exhibit 241, a survey that was created for Bush Island's 2014 NRCS application. Bush Island claims that exhibit 241 does not depict the fence line, because Stevens testified that he followed "part of the fence" for his work for the NRCS application and

testified that exhibit 241 does not incorporate the western area depicted on exhibit 186 between the pink line and a light blue line, which displays the Merrick County assessment boundary lines.

We note that parts of the record are difficult to follow, including portions of Stevens' testimony, because although it is apparent that the witness is indicating locations on exhibits, the witness does not sufficiently describe his or her indications with testimony. In this instance, Stevens was asked whether the light blue lines on exhibit 186 were also the shape of the lines depicted on exhibit 241. According to the record, Stevens replied, "In here, from about right there to about right there it is (indicating)." We cannot discern from his testimony where on the exhibit he is indicating. Stevens was then asked whether exhibit 241 incorporated "that area between the pink fence and the light blue" shown on exhibit 186, and he replied, "No."

Our review of exhibit 186 reveals two locations where the pink and light blue lines diverge. Neither of these locations affects the boundary fence at issue in this case. One location is on the northeast portion of the north fence before the fence turns south and forms Bush Island's eastern boundary. This portion of the fence is east of the Lockenvitzes' property, and thus, it separates Bush Island from a northern neighbor who is not a party to this case. Accordingly, any evidence regarding that portion of the fence does not affect the outcome of the case.

The other location is at the west fence. Despite Bush Island's argument, it is not clear from the record before us that this is the area to which Stevens referred in his testimony. And we note that the pink line depicting the west fence is curved, whereas the light blue line depicting the county assessment boundary is straight. The similarly located line on exhibit 241 is also curved and appears to be in the same location as the pink line on exhibit 186. Where credible evidence is in conflict, the appellate court will give weight to the fact that the trial court saw the witnesses and observed their

demeanor while testifying. *Babel v. Schmidt*, 17 Neb. App. 400, 765 N.W.2d 227 (2009). Because the district court was able to observe Stevens' testimony and view his indications on exhibit 186, we give weight to its determination that exhibit 241 accurately depicted the fence between Bush Island and the defendants.

We additionally reject Bush Island's contention that the language of the district court's order establishing the boundary line as "consistent with" exhibit 241 leaves Bush Island unclear as to where the boundary lies. Bush Island representatives are familiar with the fence and its location, and pursuant to a request from Bush Island, Stevens resurveyed the fence and incorporated information from his fieldwork into exhibit 241, which Bush Island utilized for its 2014 NRCS application. The district court's order is clear that it established the boundary at the fence line based on its finding that the parties agreed to such a boundary line. We therefore conclude that the defendants met their burden of establishing the boundary line.

In addition to raising issues regarding the fence, Bush Island assigns numerous errors related to the district court's decision to award title to Islands 1 through 8 to the Kortums. The district court determined that Bush Island failed to prove by a preponderance of the evidence that land west of the west fence which encompasses Islands 1 through 8 is accretion to Islands 5 and 6. The court also observed that Bush Island did not make a claim of adverse possession related to those islands, but, regardless, that Bush Island would not have been able to prove a claim of adverse possession because it did not exercise exclusive possession of Islands 1 through 8 at any time since 1965. The court therefore identified the remaining question as whether these islands were owned by the Kortums, the Allens, or Sands. None of these parties cross-appealed the decision to award title to these islands to the Kortums, and Bush Island does not challenge the court's factual finding that Islands 1 through 8 are located west of the west fence. Because

we affirmed the district court's determination that the west fence forms the western boundary between Bush Island and the defendants, Bush Island cannot claim ownership of Islands 1 through 8. Thus, we need not further address any issues related to these islands.

Bush Island's final assigned error relating to the defendants alleges that the district court erred in allowing the defendants to amend their counterclaim during trial. After several days of trial, the defendants filed a motion for leave to file a second amended answer and amended counterclaim. The amended pleading sought to add a specific claim of "Boundary Fence by Adverse Possession and Acquiescence" related to land north of the north fence and west of the west fence and asked the court to establish the boundary line consistent with exhibit 241. The court granted the motion and allowed the defendants to file their amended pleading.

[14] Permission to amend a pleading is addressed to the discretion of the trial court, and an appellate court will not disturb the trial court's decision absent an abuse of discretion. *InterCall, Inc. v. Egenera, Inc.*, 284 Neb. 801, 824 N.W.2d 12 (2012). We find no abuse of discretion in the decision to grant leave to amend.

At the hearing on the motion, the defendants clarified that their motion was filed under Neb. Ct. R. Pldg. § 6-1115(b), which allows amendment of pleadings to conform to evidence presented at trial and provides in relevant part

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

On appeal, Bush Island argues that it was prejudiced by the court's allowing the defendants to amend their counterclaim

during trial. At the hearing on the motion to amend, however, Bush Island acknowledged that the defendants had raised the issue of the boundary fence in their previous pleading and admitted that it had notice that the boundary fence had been at issue. We agree that the defendants' previous answer and cross-claim raised the issue of boundary by acquiescence when it alleged that the Kortums have title to the lands described therein "based upon an accretion survey and mutually agreed upon boundary of the same property, which was agreed upon by [the Kortums] and [Bush Island], or their respective predecessors in interest" and made identical claims with respect to the Lockenvitzes and Krugs. Although the defendants' previous pleading was titled as an answer and "crossclaim," it also requested that the court establish the boundary line as to "all indispensable parties." Further, the district court's order granting the defendants leave to amend determined that the defendants' "original allegations relate to the fence as being a boundary fence between the properties," a conclusion that Bush Island does not challenge. Thus, because the issue of the boundary fence was raised in the defendants' previous pleading, no amendment as to that issue was necessary.

Instead, the focus of the request for leave to amend was on the addition of an adverse possession claim. At the hearing on the motion to amend, Bush Island's opposition was concentrated on the adverse possession claim, arguing that an adverse possession claim "is a completely different claim than acquiescence to a boundary fence." The district court's posttrial order, however, did not grant relief to the defendants on their adverse possession claim, because it found in the defendants' favor on their boundary by acquiescence claim. Therefore, because the addition of an adverse possession claim did not affect the outcome of trial, we reject Bush Island's argument that it was prejudiced by the court's granting the defendants leave to amend.

Bush Island also argues that the district court erred in considering the defendants' amended pleading, because although

the court granted leave to amend, the defendants failed to file the pleading. However, because this issue was not specifically assigned as error, we do not address it. See *Chafin v. Wisconsin Province of Society of Jesus*, 301 Neb. 94, 917 N.W.2d 821 (2018) (to be considered by appellate court, alleged error must be both specifically assigned and specifically argued in brief of party asserting error). In any event, we have concluded that no amendment was necessary, because the claim upon which the district court granted relief to the defendants was raised in their previous pleading.

*Issues Related to Cross-Defendants.*

In its final assignments of error, Bush Island raises several claims regarding the cross-defendants, the Allens and Sands. Bush Island asserts the district court erred in finding that the Allens and Sands acquired certain land by adverse possession, finding that they are entitled to accretion land north of the south channel, granting the Allens accretion to land not at issue at trial, and finding that the Allens and Sands met their burden of establishing the boundaries for their claims.

As discussed above, we find no error in the district court's determination that Bush Island's accretion claim is limited to the north by the middle channel and to the south by the south channel, as outlined by Mussetter. Mussetter further explained that based on this conclusion, the upstream, or western, limit of the lands that Bush Island could claim as accretion is formed at the junction of the middle channel and the south channel. This junction is depicted on exhibit 366, a larger version of which was received into evidence as exhibit 396. The district court relied on these two exhibits when determining the extent of the accretion land attributed to the Allens and Sands. These exhibits also depict the upstream tip of Bush Island's accretion claim, which lies to the east of the Allens' and Sands' accretion land. Because the land the district court awarded to the Allens and Sands lies west of the western limit of Bush Island's accretion claim, Bush Island would not be entitled to any of

the accretion land the district court awarded to the Allens and Sands. As such, we need not further address Bush Island's claims regarding the cross-defendants.

### CONCLUSION

For the foregoing reasons, we find no error in the district court's decisions as outlined above. The district court's order is therefore affirmed.

Affirmed.

Welch, Judge, concurring and dissenting.

I concur with all portions of the majority's opinion except as it relates to Bush Island's claim to quiet title to the property surrounding the island itself. As to that claim, the district court dismissed Bush Island's claim in its entirety. As I read the court's order, it dismissed Bush Island's claim primarily because Bush Island attempted to claim an ownership interest to a property line extending north of the middle channel and west of the boundary fence constructed on or around 1938.

As to Bush Island's claim of ownership to a property line north of the middle channel, the district court and the majority conclude that Bush Island's claim of ownership was limited to the center of the thread of the middle channel of the Platte River at that location. They derive support for this finding from the proposition in *Heider v. Kautz*, 165 Neb. 649, 654, 87 N.W.2d 226, 230 (1957), quoting *Higgins v. Adelson*, 131 Neb. 820, 270 N.W. 502 (1936):

"Where title to an island in a nonnavigable stream is conveyed to a grantee by government patent, and the land so conveyed is bounded by the waters of such stream, the grantee's ownership carries with it the bed of the river to the center or thread of each surrounding channel."

Because the evidence established that Bush Island was bordered by the south channel of the Platte River on the south and the middle channel on the north, the majority concludes that Bush Island's ownership extends to the bed of the center or thread of each such surrounding channel. But, in *Monument*

*Farms, Inc. v. Daggett*, 2 Neb. App. 988, 995, 520 N.W.2d 556, 562 (1994), this court also held:

> The thread or center of a channel, as the term is employed, must be the line which would give the owners on either side access to the water, whatever its stage might be, and particularly at its lowest flow. *State v. Ecklund*, 147 Neb. 508, 23 N.W.2d 782 (1946). In other words, the thread of the stream is the deepest groove or trench in the bed of a river channel, the last part of the bed to run dry. Where the thread of a stream is the boundary between estates and that stream has two channels, the thread of the main channel is the boundary between the estates. See *Hardt v. Orr*, 142 Neb. 460, 6 N.W.2d 589 (1942).

It is the latter proposition of law which applies here. Bush Island and the estates on the north claim ownership interest in property between them. As to those estates, the nonnavigable stream, in this case the Platte River, has two channels between those two estates—the middle channel and the north channel. As between those two channels, the evidence unequivocally established that the north channel was the main channel, or the last to go dry. Under these circumstances, the thread of the north channel becomes the boundary between the estates. To hold otherwise would, in my opinion, contradict our prior authority on the subject. Even though there may have been some existing land between the middle channel and the north channel when the GLO first surveyed this stretch of river in the 1860's, that land apparently was not separately identified as an island, because it did not qualify with the GLO's policy of surveying only those islands with above water surface areas of at least 5 acres, while what would become Bush Island's property did so qualify. Because that property qualified as an island followed by a conveyance by government patent, the owner of Bush Island was then entitled to ownership to the bed of the main channel north of that island if more than one channel existed. As such, Bush Island, from the time of the original grant, was entitled to a claim of ownership to the

thread of the north channel—the channel that would be the last to go dry.

That said, the evidence also established that in or about 1938, the then owners of the surrounding properties agreed to the erection of a boundary fence as erected in accordance with an accretion survey performed contemporaneously. As the district court found, the parties have since accepted that fence as a boundary fence for nearly 70 years. Because I agree that the parties have long since adopted the fence line on the north, east, and west as the boundary of Bush Island's ownership interest under the doctrine of mutual recognition and acquiescence, I would find that Bush Island was entitled to relief in the form of quieting title to its property bounded to the west, east, and north by the fence as depicted on exhibit 241 and by the thread of the south channel on the south. Stated differently, although Bush Island had the right to claim property north of the middle channel at one time, it agreed to limit that claim of ownership up to the fence line by mutual recognition and acquiescence. As to that portion of Bush Island's claim, I would reverse the trial court's judgment and quiet title as indicated above.